[Crim. No. 3437.   Third Dist.   Oct. 21, 1963.]

THE  PEOPLE,  Plaintiff and  Respondent,  v.  SOLOMON
ARNOLD BUCHTEL, Defendant and Appellant.

Solomon Buchtel, in pro. per., and Robert J. Nareau, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edward Hinz, Jr., Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—This appeal is from a conviction of murder in the second degree and of assault with a deadly weapon.

There are many assignments of error, most of which we find unsubstantial; some need not be discussed. The contention most earnestly urged is that the district attorney who prosecuted the case was guilty of prejudicial misconduct and of bad faith throughout the trial and in his argument to the jury. Our study of the record leaves us critical of a tendency on the part of the prosecuting attorney to address his opponent rather than the court in making objections; equally critical of defense counsel's penchant for the leading question (when bringing out new and important evidence from defendant and his own witnesses).[1] But on neither side did the behavior reach prejudicial misconduct. Most of it was not

---

[1] We also express admiration for the trial judge's forbearance and at the same time his mastery in control of the trial.

even seriously censurable. Defendant was fairly tried.

Both the homicide and the assault followed a drunken brawl during the late hours of September 10, 1962. The murdered man was Bill Geddes; the victim of the assault, Alva Ferguson. These two plus the defendant and his wife, Frances (who is also Ferguson's sister), had been earnestly engaged in getting themselves intoxicated, separately or together, throughout the afternoon and evening of that day.[2]

At about 9:15 p.m. Geddes and Ferguson drove to the Buchtel home. Defendant had retired; Mrs. Buchtel met the late, and unexpected visitors, outside. Shortly thereafter defendant, attired only in his wife's housecoat, came into the yard. The night was warm and moonlit and the four congregated at or around a set of bedsprings located in the Buchtel yard. Mrs. Buchtel brought out wine from the house and another bottle was produced from the Geddes automobile. A period of drinking ensued which, as stated above, was, for all of the participants, a continuation of earlier tippling.

Sometime during the progress of the party Mrs. Buchtel informed Ferguson that she wanted to leave her husband and asked her brother to take her to Klamath Falls. Defendant's drinking habits appear to have been the cause of the domestic infelicity. (All parties present had had drinking problems to an extent that they had sought aid from Alcoholics Anonymous.)

Geddes argued with Ferguson that Mrs. Buchtel should not forsake defendant during his struggles with his predilection.

During this discourse Geddes, becoming drunkenly truculent, called Ferguson a big fat Indian brother-in-law; also a son-of-a-bitch. Somewhat paralogically Geddes, whose epithets had been directed toward Ferguson, pushed defendant's face into the dirt. Shortly thereafter, and apparently without provocation, Geddes attacked Ferguson, who retaliated, knocking Geddes down. When Geddes again advanced, Ferguson knocked him down a second time. Geddes called upon defendant for help. Defendant then grabbed Ferguson, who shoved defendant and knocked *him* down.

---

[2]Blood-alcohol tests of the three men and some hours after the shooting showed the following results:

*milligrams per cc.*

| | |
|---|---|
| Geddes (deceased) | 3.2 |
| Defendant | 2.6 |
| Ferguson | 1.6 |

This was followed by a third encounter between Geddes and Ferguson and again Ferguson knocked Geddes down. Defendant then made another attempt, struggling with Ferguson and was again worsted. This terminated the fist fighting, although shortly thereafter Geddes threatened Ferguson with a metal object (which may have been a wrench later found in Geddes' car). Ferguson's warning dissuaded Geddes.

Meanwhile defendant had gone into the house. The evidence is unclear but Mrs. Buchtel had apparently preceded him and may have put in a phone call to the sheriff's office for help to stop the fighting.

As to the events thus far recited, there is little conflict in the evidence, although the statement given is based principally upon the testimony of Ferguson supplemented by the alcoholic-dimmed recollection of Mrs. Buchtel.

The accounts sharply diverge as to what happened next. Ferguson testified that as he was standing at a point which he indicated as being just east of the Geddes car, defendant "came off the porch" carrying a shotgun. Ferguson's detailed account of the shooting would justify the jury's belief that defendant fired two shots, one of which struck Geddes in the right leg with its full force and caused his death, and the other of which, although a near miss, wounded Ferguson in the left thigh. Ferguson's testimony would have justified the jury's belief that the shot which killed Geddes had been intended for Ferguson. Ferguson testified he then ran toward defendant, wrestled with him for the gun and succeeded in controlling it so he was able to pump the gun to insure its chamber was empty. He then left the scene without having noticed that Geddes had been hit and was bleeding to death.

Defendant first told sheriff's officers that his first meeting with Ferguson that night was when he had answered a knock on his kitchen door, to find Ferguson standing there; that Ferguson had hit him on the head, a scuffle had ensued and he and his wife had then pushed Ferguson out of the house. Later that night defendant had said he could not remember any of the events of the evening. He repeated this statement the following day after he had sobered up.

Testifying in his own behalf at the trial defendant asserted he had gone into the house and had obtained his already-loaded shotgun while Ferguson and Geddes were fighting. Returning outside he had seen Ferguson advancing toward his wife and told him to keep away; that Ferguson had

turned and walked toward defendant who then fired a warning shot intending not to hit him. Ferguson continued to advance and grabbed his gun. In a struggle which followed Ferguson struck defendant rendering him unconscious. He was, therefore, unable to testify to subsequent happenings. However, it was the theory of the defense that Ferguson had fired the shot which killed Geddes. The jury did not accept this and substantial evidence other than Ferguson's testimony supported its conclusion that defendant had fired both the shot which wounded Ferguson and the fatal shot.

This evidence included the testimony of several neighbors who heard the two shots spaced at very brief intervals; also two spent shotgun shells were found by investigating police officers at or near where Ferguson testified the shooting took place, a point at variance with defendant's testimony.

Both under the theory of transferred intent which would have justified a conviction of first degree murder (*People* v. *Sutic,* 41 Cal.2d 483, 492 [261 P.2d 241] ; *People* v. *Williams,* 185 Cal.App.2d 457, 462 [8 Cal.Rptr. 254]), and because voluntary drunkenness is not a defense to crime but only a factor to be taken into consideration in fixing intent or the degree of the crime (which the court here properly instructed the jury to be the rule) (Pen. Code, § 22; *People* v. *Baker,* 42 Cal.2d 550 [268 P.2d 705]), substantial evidence supported the jury's verdict of second degree murder and assault with a deadly weapon. Defendant on appeal does not contest this. His attack, as stated above, emphasizes, instead, charges of misconduct by the district attorney.

None of the instances cited as misconduct by the district attorney during argument are valid assignments and only one of them need be noticed. It is contended that it was misconduct for the district attorney to refer to the testimony of one of the defense witnesses as being "worthless," that he was thereby imposing his personal opinion upon the jury. In context the statement was made with reference to an answer given by a defense witness, Oilar, to an *improper leading question* put by the defense attorney: "Q. You heard one shot, and what was the interval of time between those shots, a couple of minutes? A. I believe so." The question, already answered, was then objected to and the objection was sustained, and the witness, having had the answer "fed" to him by counsel, then repeated the sought-for answer. The testimony of four other nonparticipating witnesses had established that the time interval between shots was at most a matter of five or six seconds and under these circumstances

characterization of Oilar's estimate as "worthless" was a fair comment on the evidence and not the vouchsafing of a personal opinion by the prosecutor as to the reliability of a witness. In the decisions a fine but nevertheless clearly-marked distinction between propriety and impropriety is made in this regard. ■ A prosecuting attorney is entitled to argue fairly and draw reasonable conclusions from the evidence, including an appraisal of its weight and the credibility of witnesses so long as his argument falls short of personal guaranty and endorsement. (*People* v. *Perez,* 58 Cal.2d 229, 245 [23 Cal.Rptr. 569, 373 P.2d 617], and cases there cited; *People* v. *Houghton,* 212 Cal.App.2d 864, 871 [28 Cal.Rptr. 351].)

■ Defendant also charges misconduct of the district attorney during the taking of evidence. One contention has merit. The prosecutor asked Mrs. Buchtel during cross-examination: "Q. Did you ever live with a man without being married to him?" After the question had already been answered in the affirmative an objection was sustained. The jury was not admonished to disregard, but admonishment was not requested. The question was improper. (Code Civ. Proc., § 2051; *People* v. *Buyle,* 22 Cal.App.2d 143, 151 [70 P.2d 955].) Under the issues Mrs. Buchtel's rectitude or lack of it was without probative value. The question was prompted either by pruriency or by the hope that the jury would discredit the testimony of a witness who admitted unchastity. ■ In another case a failure by defense counsel to ask for an admonition to the jury to disregard might not rescue the misconduct from reversal for prejudice. Trial lawyers are well aware that frequently admonitions to a jury to disregard that which has already been implanted in their minds serve only to emphasize and underline and sometimes transform the inconsequential into indelibility. So are the courts aware of this; and reversal will follow where the case is evenly balanced or the error is of such a character that a harmful result cannot be cured. (*People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

■ There was no prejudice in this case. Squalid depravity was uninhibitedly portrayed by all participants to the tragic events of the crime. Mrs. Buchtel's lack of moral rigidity was already quite apparent in the record when the improper question was asked. Moreover, her testimony was not an important cog of the defense. Her memory of the events of the evening was so dimmed by frankly admitted inebriety

that there was substantially nothing to impeach. Defendant was not prejudiced by the district attorney's improper question. (Const. art. VI, § 4½.)

A number of comments and statements of the district attorney during the course of the trial are cited as misconduct. We deem it unnecessary to discuss these at length. Most of the statements, improper because they were addressed to defense counsel, would have been without impropriety had they been addressed as objections to the court. Of a total of 17 now complained of statements, trial counsel objected only to two. ■ Ordinarily no error can be assigned for the first time on appeal to statements unobjected to at the trial. (2 Witkin, California Procedure, Trial, § 10, p. 1735.) Instead of prejudicing the jury against defendant such statements generally backfire. (See the comments of Justice Draper in *People* v. *Lucas,* 160 Cal.App.2d 305, 310 [324 P.2d 933].)

■ Moreover, in this case the pot denounces the kettle. For example, objection is made to a statement by the prosecuting attorney: ''Why don't you get sworn and testify yourself'' which was, of course, indecorous. Placed in context we find it forgivable.

Defense counsel was questioning a witness regarding the reputation of Alva Ferguson for veracity: ''Q. Do you know his general reputation? A. Yes. Q. Does he have a general reputation for being a liar? . . . Mr. A—: Let this witness testify, not Mr. P—. THE COURT: Overruled. Mr. P—: To satisfy Mr. A—, what is that reputation? A. You mean not telling the truth, do I say — Q. Yes? A. — why I think that? Q. *No, just say he doesn't tell the truth.* You also know his reputation — (Laughter) Mr. A—: Oh, your Honor, boy! (Laughter) Mr. A—: Why don't you get sworn and testify yourself?'' This was followed by a statement by the court as follows: ''Ladies and gentlemen of the jury, whatever the provocation, please do remember that we are engaged in a serious business. Counsel, if they have an objection, will state it to the Court.''

We have mentioned this incident because it is typical. We find in the transcript matching instances of side remarks by defense counsel. Efforts by both attorneys to revert ''to the ancient form of trial by champion'' (to borrow the apt phrase of Justice Draper in *People* v. *Lucas, supra,* at p. 309) were only occasional. We overemphasize the importance of these transgressions perhaps by noticing them. When they occurred the trial court was quick to bring the progress of the trial back onto even keel.

We now refer briefly to some, but not all, of defendant's other contentions:

■ The trial court did not err in permitting the district attorney during the trial to pull the trigger, pump and again pull the trigger of the shotgun which was in evidence. The experiment was performed to enable a prosecution witness to fix her recollection and estimate of the time interval between the shots heard by her on the night of the shooting. After the experiment she testified that the interval might have been a second or two longer than the interval between the two trigger pulls as performed in court.

■ Demonstrative evidence is admissible so long as it tends to prove a material issue or to clarify the circumstances of a crime. (*People* v. *Robillard,* 55 Cal.2d 88, 99 [10 Cal. Rptr. 167, 358 P.2d 295, 83 A.L.R. 2d 1086].) ■ Details of the experiment must reasonaby approximate those being simulated. But the trial court has wide discretionary power in such determination. (*People* v. *Roberts,* 40 Cal.2d 483, 490-491 [254 P.2d 501]; *People* v. *Dyer,* 11 Cal.2d 317, 321 [79 P.2d 1071].) Defendant contends that here the demonstration was improper because the jury was being asked to assume that the reactions of the district attorney (sober) and of the defendant (intoxicated) were the same. The experiment performed in this case, however, did not purport to simulate the actual shooting and the jury could not have been misled to believe that it did. The district attorney operated the gun as rapidly as it could be done mechanically. The purpose was only to provide the witness a convenient gauge by which she could measure this against a time interval, as she had previously stated it in her testimony. Nowhere do witnesses find greater difficulty of thought expression than in the measurement of time. Solemn estimates that a speeding vehicle requires several *minutes* to cross an intersection are not uncommon. In this case, one defense witness had spaced the time interval between shots at "a couple of minutes" while prosecution witnesses had placed the interval at a few seconds. Measurement, therefore, against the demonstrated maximum possible speed of operation of the gun was, under the circumstances, a reasonable method to test what actual time-period the witness had had in mind by her time-description. The court did not abuse discretion in permitting the experiment.

■ Chief Criminal Deputy Hart of the Shasta County Sheriff's Office was called as a *defense* witness. He was asked

only his name and occupation and was then asked whether he had gone to school with Alva Ferguson. He replied that he had not. Defense counsel then sought and was refused permission to impeach the witness as to the accuracy of this statement.

Damage to the party calling the witness, materiality and surprise are the three elements which must exist as conditions to the right to impeach. (*People* v. *Pickens,* 190 Cal. App.2d 138, 147 [11 Cal.Rptr. 795].) The first two elements were nonexistent here. When defense counsel was given an opportunity (outside the presence of the jury) to explain wherein a school acquaintanceship between Hart and Ferguson could be material or relevant to the defense he did not do so. The court then stated: "... [I]nasmuch as this present witness has not previously been a witness nor testified to anything there is no present basis for impeaching him." To this, defense counsel replied: "I am fully aware of that."

The court's ruling was not only acquiesced in; it was correct. (*People* v. *Flores,* 37 Cal.App.2d 282, 287 [99 P.2d 326].)

Defendant complains of the insufficiency of the court's instructions on justifiable homicide. The actual instructions given are not before us,[3] and were not requested as part of the record on appeal. Defendant is precluded, therefore, from challenging their insufficiency. (*People* v. *Cook,* 167 Cal.App.2d 247, 250 [334 P.2d 307].) Moreover, the court did enumerate by appropriate subject-headings the matters on which he would instruct the jury. These are stated in the reporter's transcript. Included is "Self-defense as justification." If we assume that the court adequately instructed the jury on self-defense as justifiable homicide (and we must assume this on this appeal), it is not apparent how a failure to instruct on any other of the instances in which homicide is justifiable could have been prejudicial. The only theory of the defense was that defendant had armed himself with a shotgun to protect himself from Ferguson; that he had shot Ferguson accidentally while intending only to warn him and that it had been Ferguson who, after knocking him unconscious, had shot Geddes. This theory left no

---

[3]Certain instructions reread to the jury at their request during their deliberations were made a part of the Reporter's Transcript. We have referred to one of these above (see *ante,* p. 486). Instructions given on justifiable homicide were not reread.

room for instruction on justifiable homicide other than self-defense. Certainly, it left no room absent a request for such an instruction. (*People* v. *Wade,* 53 Cal.2d 322, 333-334 [1 Cal.Rptr. 683, 348 P.2d 116].)

Other contentions on appeal are insufficiently meritorious to justify mention, except to note in conclusion the somewhat resourceful argument by counsel for defendant *on appeal* that defendant cannot be charged with the failure by his *trial* counsel to have made timely objections because such failure establishes that incompetent counsel was appointed to represent him, which itself is a ground for reversal. Ingenuity rather than worth characterizes the argument. ▮ In the first place, inadequacy of defense counsel is not a ground for reversal on appeal unless ''counsel displays such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.' '' (*People* v. *Wein,* 50 Cal.2d 383, 410 [326 P.2d 457] ; *People* v. *Ricks,* 161 Cal.App.2d 674, 678 [327 P.2d 209].) Moreover, while criticism has been directed above both to the prosecuting attorney and to trial defense counsel, such disapprobation does not by any means add up to any finding by us of incompetent advocacy. On the contrary, a reading of the transcript and consideration of the trial as a whole shows that defendant has had both diligent and reasonably competent representation in the presentation of a defense, the weakness of which lay not in any inadequacy of advocacy but in its irreconcilability with truth.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.

A petition for a rehearing was denied November 15, 1963, and appellant's petition for a hearing by the Supreme Court was denied December 18, 1963.