[Crim. No. 5299.   First Dist., Div. One.   June 22, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD ROBERT CONOVER, Defendant and Appellant.

Pelletreau, Gowen, Moses & Porlier and William P. Moses for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and William D. Stein, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, P. J.—A jury found defendant guilty of receiving stolen property (Pen. Code, § 496). He appeals[1] from the judgment of conviction.

In the early part of 1964 Gorman Rose, who was employed as a driver of a cement mixer, accidentally met defendant with whom he had first become acquainted seven to nine years before. They stopped to talk and in the course of the conversation the subject of "chain saws" arose. Defendant told Rose that he "frequently" had the opportunity to obtain such saws and asked him "if I do [obtain them], would you be interested in some?" Rose replied that he would be interested because he wanted to cut down some trees in back of his house and also because one of his coworkers was looking for some. Hearing Rose's interest, defendant said that "if I get hold of any, I'll give you a ring." Rose then gave defendant his telephone number and the men parted.

About two weeks later defendant telephoned Rose and informed the latter that he had some used chain saws to sell and asked if Rose would be interested in buying them. Rose declined, stating that he was interested only in new saws.

On April 24, 1964, the place of business of Edwin G. Baird, a chain saw dealer in Amador County, was burglarized. Taken in that burglary were six chain saws, a Mite-E-Lite generator,

[1]Defendant's notice of appeal states that he "appeals . . . from the judgment entered . . . on May 20, 1965, and from the whole thereof." Since judgment was not so entered at that early date, the notice of appeal is premature. However, the People, citing California Rules of Court, rule 31(a), do not question its timeliness. Defendant also filed a second notice of appeal, this one appealing from "the order heretofore rendered on July 22, 1965." The record discloses no order of any kind rendered on that date. It may well be, as defendant's briefs seem to imply, that he is appealing from the June 23, 1965, order denying his motion for new trial. If such be his intent, this attempted appeal must be dismissed since such an order is nonappealable. (Pen. Code, § 1237; *People* v. *Justice* (1963) 211 Cal.App.2d 660, 662 [27 Cal.Rptr. 465].)

some chains and some cutter bars, along with the cash register and some cash. The wholesale value of the items taken was $1,761.61. The cutter bars were in cardboard containers which, when received by Baird from the supplier, had labels on them.

On April 25, 1964, a Saturday, the day after the burglary, Rose received a telephone call from defendant who told him that he had five chain saws and gave the latter the model numbers. On the following Monday or Tuesday defendant telephoned Rose again, saying that he had another prospective purchaser and was interested in getting rid of the saws. Rose thereupon talked to LeBouef and Dougherty, contractors, who had a yard behind his place of employment and who he thought might be interested in buying the saws. On Wednesday evening defendant again called Rose, asking him if he was "interested in the chain saws." Rose replied that he was, "if they are not hot." Assured that they were not, Rose told defendant that "LeBouef and Dougherty would like to purchase them." Under the terms of the transaction each item (saws and generator) was $100, with Rose to meet defendant and pick up the goods at 5300 Garvin Street in Richmond on Thursday evening.

On the next day, Thursday, Rose drove to the last mentioned address which was occupied by Nancy Hagerty, defendant's fiancee and later his wife. Defendant arrived at about the same time. According to Rose's story defendant told him to come in, that the saws had not yet arrived but that the man delivering them should be on his way over.

While waiting, defendant and Rose were sitting in the living room when, at defendant's suggestion, they made a brief tour of the garage, apparently looking at a mirror, and then returned into the house. About 15 minutes later a green 1956 Mercury drove up. Rose started out of the house to accompany defendant to this car but was told by defendant to "wait a minute," that he wanted to talk to the men in the car. Rose remained in the house talking to defendant's fiancee for about five minutes when defendant came back in and informed Rose that "your chain saws are around in the garage. Just back up and get them in your pickup." Rose did as he was told.

Upon entering the garage Rose observed "five or six chain saws, a generator and some chain bars," none of which had been there on his prior brief visit to the garage. The cutter bars (except one) were in cardboard containers, each bearing a

name plate type of label. Defendant remarked that he would "like to take this name off because I wouldn't want the fellow to know where I get my merchandise." They thus took a tire iron, the screwdriver-like end of which they embedded into the cardboard, and "ripped the name plate off." The goods were then loaded onto the back of Rose's truck. The agreed price of $100 per item remained fixed[2] and arrangements were made for Rose to pay defendant the next afternoon (Friday). Rose then departed.

From 5300 Garvin Street Rose drove to LeBouef's contracting yard, where he delivered to LeBouef five chain saws[3] and five cutter bars. That left Rose with one chain saw and the generator, both of which he took to his residence. LeBouef, meanwhile, put the saws in his warehouse and then "called the manufacturer to find out if they were stolen or anything." A man was sent over who determined that the saws and bars had been stolen from Sacramento. LeBouef then called Sergeant Baroni of the Richmond Police Department who, after arriving at LeBouef and Dougherty's yard and ascertaining that they were the stolen items, took possession of the saws.

In the afternoon of Friday, May 1, 1964, Richmond Police Officer Baroni and Sergeant Ritz,[4] interviewed Rose at his place of employment, informed him that he was in possession of stolen property and placed him under arrest. Rose was released the next day and was never prosecuted on any charge. On Friday evening defendant went to Rose's place of employment looking for him. He was told that Rose might be in the restaurant across the street. Madeline Mullins, the proprietress of the restaurant, testified that between 7 and 8 p.m. defendant came into the restaurant and asked for Rose.

Sergeant Ritz and Officer Franklin, having obtained Miss Hagerty's address during the course of their interview with Rose, thereafter obtained a warrant for the search of the Garvin Street premises. They were joined there by Richmond

---

[2]Apparently later that night, after he delivered the items to LeBouef, Rose telephoned defendant to inform him that there were parts missing on certain of the items and that LeBouef wanted them repaired. After Rose told defendant that "Joe LeBouef thought a hundred dollars would cover the repair," defendant agreed to "knock a hundred dollars off."

Also, on the stand Rose admitted that by acting as middleman in this transaction he would make "$50 and a chain saw."

[3]LeBouef testified that Rose delivered four chain saws.

[4]Sergeant Ritz was deceased at the time of trial. However, he had testified at the preliminary examination and counsel stipulated that his testimony therefrom could be read into the record.

Police Officer Redding, an "ID technician." The search uncovered pieces of labels in a garbage can on the premises. These labels were identified by Mr. Baird as the identical type of label which was on the cutter bar containers when he first received them.

The case in defense presented substantially the same facts with one marked difference: according to the defense's theory of case it was Rose who attempted to *sell* the merchandise to defendant. Defendant, taking the stand in his own behalf, admitted the initial accidental meeting and discussion with Rose about chain saws, admitted that at said time Rose told him that he, Rose, was desirous of *buying* a chain saw and admitted that thereafter he, defendant, telephoned Rose and asked the latter if he wanted to buy a used chain saw. Defendant then testified that in April Rose telephoned defendant and "asked me if I was still interested in chain saws and I said well, I am interested in motors. . . . He told me that he had access to some new ones. I said well, it really didn't matter to me whether they were new or used, that I just needed them for these hydrocarts and go-carts." According to defendant, Rose stated he would like to meet defendant at which time he would show defendant the saws and discuss price. Arrangements were made to meet at Nancy Hagerty's house. When defendant arrived, one Howard Hundley, who was interested in buying defendant's automobile, was already there. Rose arrived at about the same time. After defendant and Hundley concluded their business, Rose, according to defendant, backed his truck into the garage and showed him some motors lying on the bed of the truck, offering all of them to defendant for $50 each. Hundley was in the garage during part of this conversation. Defendant told Rose he was not interested. At about this point, Rose stated that he did not want anyone to know from whom he was getting the motors because he was "selling them below his price." Rose asked defendant for "a scraper or something" and then asked Hundley for a knife. Defendant testified that he then went into the house; that when he left Rose was tearing off some of the labels; that defendant did not remove any labels; that he never took or had possession of the motors at any time; that he told Rose he needed some cement whereupon the latter promised to bring him some; and that when Rose did not bring the cement the next day, defendant went to Rose's place of employment and then to the nearby restaurant looking for him.

Howard Hundley testified that he was present at Nancy

Hagerty's house on the last mentioned occasion to buy defendant's automobile, that he saw Rose back his truck up to the garage and saw "some new looking motors" in the truck-bed, that Rose was trying to sell the motors to defendant and that Rose asked him "for a pocket knife to take off some kind of labels."

Nancy Conover, defendant's wife, formerly Nancy Hagerty, testified as to the arrival of defendant, Rose and Hundley; that defendant and Rose came into the house while Hundley remained outside; that defendant went outside again and she and Rose "talked for a minute," that Rose pulled his pickup truck into the garage; and that the next day she "saw a mess in the garage," swept it up and put it in the garbage can.

Defendant raises no question as to the sufficiency of the evidence to support the judgment. His sole contention on appeal is that the prosecuting attorney committed prejudicial misconduct on a number of occasions. However the record shows, and defendant concedes, that defendant did not at any time make an assignment of misconduct or object to the alleged misconduct in any way and that the jury was not on any occasion admonished to disregard it.

Defendant now urges the following five specifications of misconduct:

*First*: The first specification embraces three instances of alleged misconduct in the prosecutor's opening and closing arguments to the jury. In substance it is charged that the prosecutor's statements on the occasions constituted misconduct by implying that defendant, defendant's wife Nancy Conover and defense witness Hundley with the encouragement and at the direction of defense counsel were perjuring themselves.

1. At the very outset of his opening argument the prosecutor stated that the jurors were entitled to observe the demeanor of all the witnesses and whether they contradicted themselves or were contradicted by other evidence, continuing: "You are entitled to believe any of their story, all of their story, part of their story, or believe some and disbelieve some. That's up to you. You are the judges in this matter, do you see, *and I say this to you because it is very obvious in this particular case somebody is doing a lot of tall lying, do you see.* Perjury has been floating around this courtroom like I have never seen it before. You as the judges here are people who are going to have to determine which witnesses are telling the truth and which witnesses were not." (Italics added.)

Defendant complains of the italicized portion. It will be noted that the prosecutor's remarks at this point are not directed specifically to witnesses produced by the defense but to *all* witnesses produced by *both* sides. In the light of the diametrically opposed accounts given by the prosecution and by the defense as to who was the seller and who was the potential buyer of the saws, it is obvious that one of the sides was not telling the truth on this issue and that the divergence of their stories was not due to inadvertence or mistake. The epithet "lying," while blunt, was accurate: to "lie" is "to make an untrue statement with intent to deceive." (Webster's Third New International Dictionary.) Under the circumstances, we do not consider the remark improper, although as we explain *infra,* we do not approve of the prosecutor's reference to "perjury" in the following sentence, to which incidentally defendant makes no objection.

2. The prosecutor devoted a substantial portion of his opening argument to attacking the veracity of defense witness Hundley. In the course of these remarks he commented on the failure of the defense to call Hundley at the preliminary examination and Hundley's failure on his own to come forward before the trial and exonerate defendant, his friend. In this regard the prosecutor said: "The defense didn't bring him in at the preliminary examination to exonerate the defendant. I will ask you why didn't they and I'll tell you why they didn't—because they knew his story wouldn't stand the light of day, give us a little time to shake loose on it and we'd break it loose, do you see? That's why they didn't. They knew this man couldn't stand the scrutiny of investigation, *that his story was a mass of fabrication from end to end."* (Italics added.)

Very shortly thereafter,[5] the prosecutor continued: "He didn't make any effort to go to the police department and I ask you then, are these the actions of an innocent man? *No, what they do, they bring us to trial, put a man up there on that stand and let him perjure, knowing that I can't do too much about it right in the course of trial,* because I don't have time to investigate and this and that and the other thing. That is exactly what happened, don't you worry about this. *It's all been carefully engineered and carefully planned and well thought out."* (Italics added.)

3. This comment upon perjury is echoed in the prosecutor's

[5] Just 16 lines later in the transcript.

closing argument: "*The only smoke screen that's been thrown up here has had perjury written all over it and it's been a smoke screen thrown up by the defense. That Howard Hundley is a perjurer from the word go.*" (Italics added.)

We consider all of these remarks (i.e., No. 2 and 3, *supra*) together, as does defendant who complains of the italicized portions thereof. It is argued that the remarks not only constitute misconduct in themselves but additionally, when considered with particular reference to the last sentence of the second excerpt ("It's all been carefully engineered" etc.), all of the statements "strongly imply that this perjury was encouraged by the defendant and suborned by the defense counsel."

While we do not agree that the prosecutor implied that defendant's trial *counsel* knowingly participated in the production of false testimony[6] we think that with this qualification the remarks were highly improper. In essence, the prosecutor stated that Hundley was a perjurer and that defendant suborned perjury. As we explain, *infra,* the reference to defendant's method of producing Hundley at the trial but not at the preliminary hearing was also improper. Confining ourselves here to the essence of the remarks, we find them to constitute misconduct on two bases.

Initially, the statements were improper because in their general tenor they were expressions of the prosecutor's personal belief in the unreliability of the defense witness Hundley. ■ As the court said in *People* v. *Perez* (1962) 58 Cal.2d 229, 245-246 [23 Cal.Rptr. 569, 373 P.2d 617]: "While a 'prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom' [citation], and in his argument to the jury the prosecutor may comment upon the credibility of witnesses 'in the light of all the evidence in the case' [citations], '[i]t is misconduct for a prosecuting attorney to express his personal belief as to the reliability of a witness.' [Citations.] ■ Such an expression of personal opinion is misconduct whether the prosecutor is seeking thereby to bolster testimony which was in support of the People's case [citations], or whether the People's representative is attempting to discredit the credibility or reliability of witnesses

---

[6]We find nothing in the prosecutor's argument charging or insinuating that defendant's counsel was personally involved in suborning perjury. On the contrary, at the very beginning of the argument, the prosecutor expressed respect and even affection for defendant's counsel.

testifying in support of the defendant. [Citations.]'' (In accord: *People* v. *Pantages* (1931) 212 Cal. 237, 245-248 [297 P. 890] ; *People* v. *Buchtel* (1963) 221 Cal.App.2d 397, 403 [34 Cal.Rptr. 437], cert. denied 377 U.S. 942 [84 S.Ct. 1356, 12 L.Ed.2d 309] ; Witkin, Cal. Criminal Procedure (1963) § 458, 459, pp. 462-463.)

Additionally, the prosecutor's remarks bear an even greater stigma of impropriety because the prosecutor thereby charged Hundley and defendant with the commission of felonies, perjury (Pen. Code, §§ 118, 126) and subornation of perjury (Pen. Code, §§ 127, 126) respectively, of which neither of them had been convicted, thus attempting to impeach each of them indirectly or obliquely. (*People* v. *Reese* (1963) 220 Cal.App.2d 143, 146-147 [33 Cal.Rptr. 561].) In *Reese, supra,* the prosecutor, commenting on the testimony of five defense witnesses, told the jury : '' 'Now, I am not going to say that they are all lying. But some of them are. Some of them were. Some of them have committed perjury, but some of them I think are just a little over eager to help out a friend or relative.' '' (P. 146.) Reversing the conviction because of the above and one other instance of misconduct, *despite the absence of objections* thereto at the trial, the court said : ''The district attorney had a perfect right, even a duty, to go over the testimony of each witness and point out any discrepancies therein and explain to the jury how these discrepancies indicated false testimony. But here the district attorney, rather than discredit the testimony of a particular witness, *indirectly branded defendant's witnesses as possible felons.* The critical objection is that by this technique the district attorney is able *to obliquely impeach a witness* by charging him with the commission of a felony *of which he has not been convicted.* A witness on the stand cannot be impeached by an accusation of perjury unless the witness has been convicted thereof, since impeachment of this character stems from a prior conviction of a felony. An attorney should not be permitted to accomplish by argument that which he is precluded from doing by cross-examination.'' (Italics added.) (P. 147.)

*Second* : In his opening argument to the jury, the prosecutor stated : ''Remember this : that the defendant is not charged with stealing this property. We are not saying he stole in Sutter Creek. We don't know who stole it; all we know it was burglarized from the premises up there; all we know is it turned up next in the possession of the defendant. Now we accuse the defendant of the crime of receiving stolen property,

knowing that it was so stolen at the time he received it, with intent to permanently deprive the owner thereof, do you see."

Defendant argues that "Although this statement does not directly claim the defendant stole the property, it is an apparent attempt to plant in the mind of the jury suspicions that the defendant was guily of such conduct." We do not perceive how the remarks carry the implication charged. The language merely appears to stress what the prosecution was not concerned with proving and what it had to establish to support the charge, namely that defendant *received* stolen property "knowing the same to be so stolen." (Pen. Code, § 496.) These remarks were proper.

*Third*: As previously noted under the first specification of misconduct, the prosecutor in both his opening and closing arguments to the jury emphasized defendant's failure to produce Hundley as a witness at the preliminary examination as well as Hundley's own failure to take affirmative steps to assist his friend.

Defendant complains of the first sentence[7] of an excerpt quoted by us *supra* (First specification, No. 2) and of the italicized portion of the following remarks made shortly thereafter : "Once again, I say to you that it smells to high heaven. *I know this, that if I were an innocent man and I had somebody that could prove it I certainly wouldn't go through all the preliminary examination* and the subsequent trial if I could get away from a trial by proving my case before the preliminary examination. Even at that point I would certainly do so, wouldn't you?" (Italics added.)

Defendant argues that these "statements were intended both to imply that the chief defense witness [Hundley] was lying and that the preliminary hearing constituted a determination of the defendant's guilt." We have already discussed and need not here review the prosecutor's assertions of personal belief in the unreliability of Hundley. We reject as inapposite the second half of defendant's above-mentioned claim because it seems clear that the prosecutor's remarks were *not* an argument that defendant's having been held to answer was evidence of his guilt. If such had been the argument it would have constituted misconduct. (*People* v. *Whitehead* (1957) 148 Cal.App.2d 701, 706 [307 P.2d 442].)

---

[7]These remarks were: "The defense didn't bring him in at the preliminary examination to exonerate the defendant."

The actual question is this: Was it misconduct to comment on the failure of defendant to produce Hundley as a witness at the preliminary hearing? ▮ Although a prosecutor may properly comment upon a defendant's failure to produce a material witness *at the trial* (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 357-358 [23 Cal.Rptr. 779, 373 P.2d 867], cert. denied 372 U.S. 952 [83 S.Ct. 950, 9 L.Ed.2d 977] ; *People* v. *Basler* (1963) 217 Cal.App.2d 389, 401 [31 Cal.Rptr. 884] ; *People* v. *Miller* (1961) 196 Cal.App.2d 171, 177 [16 Cal.Rptr. 408] ; *People* v. *Carter* (1953) 116 Cal.App.2d 533, 539 [253 P.2d 1016]), no authority has been cited or found permitting comment by the prosecutor on the fact that defendant did not produce at the preliminary hearing a witness called at the trial. ▮ A preliminary hearing is not a trial and a magistrate presiding at such hearing does not sit as a judge of a court. (*People* v. *Newton* (1963) 222 Cal.App.2d 187, 189 [34 Cal.Rptr. 888].) ▮ "The purpose of this hearing is to determine whether a public offense has been committed, and whether there is sufficient cause to believe the defendant guilty thereof." (*Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 149-150 [114 P.2d 335, 135 A.L.R. 775] ; see Pen. Code, § 872; *People* v. *Brice* (1965) 234 Cal.App.2d 258, 271-272 [44 Cal.Rptr. 231].) ▮ "Guilt is not the issue before the committing magistrate." (*People* v. *Sears* (1954) 124 Cal.App.2d 839, 851 [269 P.2d 683].) ▮ Defendant was entitled to produce Hundley as a witness at the preliminary examination, if he so desired, and "any witnesses the defendant *may* produce must be sworn and examined." (Italics added.) (Pen. Code, § 866.) ▮ If the People have established reasonable cause for a commitment, no unfavorable inference should be drawn against the accused because he did not by his own evidence raise a conflict as to his guilt. ▮ The determination of his guilt was an issue to be tried in the superior court. As a consequence, the practice of not offering evidence on behalf of the defendant at a preliminary hearing is well-known and frequently adhered to, of which we are sure the prosecutor must have been well aware. We think the prosecutor's remarks were improper.

▮ *Fourth*: Defendant contends that the prosecutor committed prejudicial misconduct by making the statements set forth in the footnote[8] during his closing argument to the

---

[8]The prosecutor argued: "He [defense counsel] says Mr. Holt [the prosecutor] is going to get up and tell you that Gorman Rose is guilty but that Conover is guilty too. Now I'm going to tell you one thing: if

jury. It is urged that in view of the two sharply contradictory theories of the prosecution and the defense, the above statements amounted to personal assertions by the prosecutor that Rose was innocent and defendant was guilty. We agree.

The gist of the argument at this point clearly and plainly was that the district attorney would not have prosecuted defendant if he had not believed defendant rather than Rose guilty of receiving the stolen property. Such an argument is improper and constitutes misconduct and has been held in a number of cases to require reversal even though it was not objected to by the defendant and even though no request was made of the court to admonish the jury to disregard it. (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 723 [249 P.2d 1]; *People* v. *Love* (1961) 56 Cal.2d 720, 730-731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Alverson* (1964) 60 Cal.2d 803, 808-809 [36 Cal.Rptr. 479, 388 P.2d 711]; see generally Witkin, Cal. Criminal Procedure (1963) pp. 460-462.)

In *Kirkes* the court said: "It is well established that statements by the prosecuting attorney, not based upon legitimate inferences from the evidence, to the effect that he has personal knowledge of the defendant's guilt and that he would not conduct the prosecution unless he believed the defendant to be guilty are misconduct. [Citations.] 'There can be no excuse for such comment.' [Citation.]" (P. 723.)

In *People* v. *Edgar* (1917) 34 Cal.App. 459, 468 [167 P. 891], quoted with approval in both *Kirkes* and *Alverson*, and noted in *Kirkes* as containing the "classic expression of the rule," the court said: "When the district attorney declared that he would not prosecute any man he did not believe to be guilty he thereby wrongfully placed his personal opinion of the guilt of the defendant in evidence in the case. He was

---

there is one thing I am not going to tell you is that Gorman Rose is guilty. *If I felt Gorman Rose were guilty he'd be sitting in Mr. Conover's chair here today. If after all the investigation and all the reports and all the data which I have in my control before issuing a complaint, if I really believed Gorman Rose was guilty Mr. Conover wouldn't be sitting there; Gorman Rose would be, you had better believe that.*" (Italics added.) Shortly thereafter he concluded his argument thusly: "I submit to you once again, if you'll go over the testimony of all the witnesses, including the defense witnesses, do you see. Actually, defense witnesses testified for the prosecution, *and I say to you that there should not be any doubt in anyone's mind as to the guilt of the defendant. We believe this sincerely or we wouldn't have brought this case to trial.* The evidence clearly shows this and based upon this evidence and based upon the fact that you are under oath here to act as individual judges in this matter, we ask that you see that justice is done and that you return a verdict of guilty in this matter." (Italics added.)

privileged to argue to the jury that it was his opinion formed from deductions made from the evidence adduced at the trial that the defendant was guilty of the crime charged [citation]; but his declaration to the jury that he would not prosecute any man whom he did not believe to be guilty was tantamount to an assertion that he believed in the guilt of the defendant at the very inception of the prosecution; and necessarily such belief must have been founded upon the result of the district attorney's original and independent investigation of the charge, and therefore in all likelihood was based, in part at least, upon facts which did not appear and which perhaps could not have been shown in evidence.''

The present situation is not unlike that in *Alverson* where the prosecutor, by telling the jury that he personally believed one defendant to be innocent, necessarily told them at the same time that he personally believed the remaining defendants to be guilty. Apposite here is the following language from that opinion: ''The tactics used by the prosecuting attorney necessarily disturbed the delicate balance between the defense and prosecution to the disadvantage of appellant Alverson. At the very outset of the trial the prosecutor comes into the case as a champion of the People paid to prosecute offenders. The very importance of that position is, of course, apparent to the jury. The defendant has, in his favor, the presumption of innocence. But, if in addition to his basic advantage of being the champion of the People the prosecutor is to be permitted to stand before the jury like a knight in shining armor, and state that he would not think of prosecuting a man he believed to be innocent, and that he personally believed one of the defendants whose testimony had implicated the other two defendants, then the prosecutor has secured a very unfair advantage indeed.'' (60 Cal.2d at p. 808.)

*Fifth*: Defendant *for the first time* in his closing brief asserts that the prosecutor was guilty of misconduct in his cross-examination of defense witness Hundley. While such a point raised for the first time in the appellant's reply brief need not be considered (*People* v. *Eberhard* (1952) 114 Cal. App.2d 133, 136 [249 P.2d 590])[9] we have decided to entertain it since it falls within the general category of the issue of

---

[9]This general rule has been developed in a number of civil cases. (See: *Kahn* v. *Wilson* (1898) 120 Cal. 643, 644 [53 P. 24]; *Hibernia Sav. & Loan Soc.* v. *Farnham* (1908) 153 Cal. 578, 584 [96 P. 9, 126 Am.St.Rep. 129]; *Monk* v. *Ehret* (1923) 192 Cal. 186, 190 [219 P. 452]; *Cooper* v. *National Motor Bearing Co.* (1955) 136 Cal.App.2d 229, 238 [288 P.2d 581, 51 A.L.R.2d 963]; *Ocean Shore R.R. Co.* v. *Doelger* (1960) 179 Cal.

misconduct raised on appeal and was covered at oral argument. Two instances of misconduct are urged.

1. Cross-examination of Hundley began with the following question: "Q. [By prosecutor] Have you ever been convicted of a felony, Mr. Hundley? A. No, I haven't." The subject was then dropped. At no time thereafter did the prosecutor offer proof of any felony conviction of Hundley. ▉ While for impeachment purposes a prior felony conviction may be shown by the examination of the witness (Code Civ. Proc., § 2051), such cross-examination is limited by the requirement that it must be conducted in good faith (*People* v. *Linyard* (1957) 151 Cal.App.2d 50, 55 [311 P.2d 57]) and the questioner should be prepared to show by documentary evidence that the witness has suffered a prior conviction in the event he denies it. (*People* v. *Perez, supra,* 58 Cal.2d 229, 238-240; *People* v. *Roberts* (1963) 213 Cal.App.2d 387, 397 [28 Cal.Rptr. 839], cert. denied 375 U.S. 909 [84 S.Ct. 204, 11 L.Ed.2d 149]; see Annotation on effect of prosecuting attorney asking defense witness other than accused as to prior convictions where he is not prepared to offer documentary proof in event of denial, 3 A.L.R.3d 965.) In the instant case, in view of the prosecutor's failure to offer proof of any prior conviction after a negative answer from the witness, the question asked Hundley was improper.

2. Because of the opening question on cross-examination just discussed, defendant further claims that certain concluding questions asked Hundley on recross-examination were "especially damaging" as being designed to discredit defendant's "one independent witness." No purpose would be served by setting forth the pertinent testimony. Most of the questions were argumentative in form and objections on that ground were sustained by the court. Defendant does not point out to us, nor are we able to ascertain, how this particular cross-examination constituted misconduct.

▉ In summary, we have concluded there was misconduct on the part of the prosecutor in eight instances: in his statements on three occasions to the effect that Hundley was a perjurer and defendant suborned perjury (First, Nos. 2 and 3 *supra*); in his statements on two occasions relative to defendant's failure to produce Hundley at the preliminary hearing (Third, *supra*); in his statements on two occasions as to his

App.2d 222, 239 [3 Cal.Rptr. 706], fn. 3; *Duncanson-Harrelson Co.* v. *Travelers Indemnity Co.* (1962) 209 Cal.App.2d 62, 70 [25 Cal.Rptr. 718]; 3 Witkin, Cal. Procedure (1954) pp. 2341-2342; 4 Cal.Jur.2d 324.)

personal belief that defendant was guilty (Fourth, *supra*); and by his improper cross-examination of defense witness Hundley in respect to a prior felony conviction (Fifth, *supra*).

However, as previously pointed out, no assignment of misconduct or objection of any kind was made in the trial court. The Attorney General argues that because of defendant's failure in this respect, he is now precluded from raising the issue on appeal. ▮ Recently in *People* v. *Ney* (1965) 238 Cal.App.2d 785, 790 [48 Cal.Rptr. 265], we summarized the pertinent rule and collected the leading cases, saying: "Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. [Citations.]" These two exceptions were set forth in the leading case of *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136] in the following language: "One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court."

Defendant claims that the present case falls within both exceptions, claiming that (a) it is "closely balanced" and (b) that the misconduct was incurable since it was continuous, extensive and sustained. Considering the latter exception first, we do not say that *none* of the acts of misconduct could have been obviated by a timely admonition to the jury. However, as previously indicated, we are not prepared to say that such an admonition could have eradicated the combined impact on the jury of the prosecutor's statements that he would not have prosecuted defendant if he had not personally believed him guilty and that defendant had "engineered" the production of perjured testimony. ▮ However, putting the second exception to one side, we think the instant case falls within the "closely balanced" case exception. This exception "simply means that when the evidence is closely balanced, the appellate court will proceed to exercise its power under article VI, section 4½ of the State Constitution to declare that the

misconduct caused a miscarriage of justice, regardless that defense counsel failed to object in the trial court.'' (*People* v. *Sorenson* (1964) 231 Cal.App.2d 88, 93 [41 Cal.Rptr. 657].)

In the instant case, the accounts given by the prosecution and defense witnesses as to the events leading up to and occurring at the Nancy Hagerty premises were in sharp conflict. If Rose was telling the truth the jury were justified in believing that defendant was knowingly in possession of stolen property and was attempting to dispose of it. If, however, Rose was *not* telling the truth and defendant, Nancy and Hundley *were,* then the jury could have justifiably believed that it was not defendant, but Rose, who had possessed the stolen property and was trying to dispose of it to defendant. If the first story was true, defendant showed his guilt by stripping off the labels; if the second story was true, it was then Rose who showed his guilt by doing so. The finding of the torn labels on the premises was consistent with either story. So also was defendant's visit on the next evening to Rose's place of business and to the restaurant consistent with either account, although probably the prosecution's explanation (defendant went to receive purchase price) was more plausible than that of the defense (defendant went to get cement).

The prosecutor in our opinion improperly disturbed the balance of this testimony by his several acts of misconduct. His misconduct was not confined to an isolated occasion or two but occurred on several occasions and considered broadly seems to have been part of a sustained and pervasive plan of argument. No excuse can be found on the ground that his statements were inadvertently made. In view of the condition of the evidence, there was grave doubt as to defendant's guilt. We think that the several acts of misconduct were ''such as to contribute materially to the verdict'' (*People* v. *Berryman, supra,* 6 Cal.2d 331, 337) and that therefore defendant did not have a fair trial. (See *People* v. *Reese, supra,* 220 Cal. App.2d 143, 147.) Under all of the circumstances of the case we conclude that a miscarriage of justice resulted.

The attempted appeal from the order rendered on July 22, 1965, is dismissed. The judgment is reversed.

Molinari, J., and Sims, J., concurred.