[Crim. No. 20077. Second Dist., Div. Five. Apr. 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE EDWARD LITTLETON, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Maury W. Corn, William R. Pounders and Gaye W. Herrington, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—An information charged defendant and appellant Bruce Edward Littleton with burglary (Pen. Code, § 459). Charles E. Greter-

man and John Matthew Hansen were charged as codefendants. Two prior convictions were charged against Littleton and admitted before the start of a jury trial. All three defendants were found guilty of second degree burglary. Littleton's motion for a new trial and his application for probation were denied and he was sentenced to state prison.

## FACTS

The evidence established without contradiction that at about 4 a.m. on March 22, 1970, Greterman and Hansen broke into the Crow's Nest bar. While these two were on the premises, Littleton was sitting behind the wheel of a pickup truck in an alley behind the bar. The truck's lights were off and its motor running. Hansen and Greterman, surprised inside the bar by a janitor, ran out into the alley and jumped into the truck which had started to leave. After a police chase the three men were arrested. An unusual number of coins were found on Greterman and in the truck. A later inspection of the bar revealed that entrance had been gained through a hole in the wall which joined the bar to a neighboring cafe which was under construction. Implements suitable for breaking into the bar's safe were found. There was expert testimony that the burglary was a professional job.

The defense, as far as Greterman and Hansen were concerned, was that they were merely trying to recapture money which they felt was owed to them by a Mr. Whitsett, the owner of the Crow's Nest. To this end evidence was offered that a few days before the burglary Hansen had an argument with "Big Jerry," one of the bartenders at the Crow's Nest, over a bet which Hansen had placed with Whitsett. Whitsett had told Hansen to see Big Jerry who had refused to pay off. This had happened on a previous occasion. The total of the money bet by Hansen was about $300 which he honestly believed was his. He never intended to take more than $300. On the night of the burglary Greterman had met Littleton and Hansen at a place called "Raffles." Greterman told Hansen that he had finally won a bet on a horse, that in the past he had bet about $250 at the Crow's Nest and that when he called the Crow's Nest earlier on the night of the burglary, to claim the payoff on this—his first—win, he was told that he had called too late, which he knew to be an untruth. He was then informed by Hansen that he would not be paid. His sole intention in breaking into the premises was to recover the $250 total he had bet at the Crow's Nest.

During the direct examination of the arresting officer, the prosecutor elicited without objection that at the time of the arrest none of the three

defendants said anything about bookmaking or any attempt to recover their own property.

A similar question was asked of one Officer Summers, a burglary expert who had examined the premises at the Crow's Nest. This time the defense objected. After the officer testified that he had interviewed the defendants separately, but had advised them of their constitutional rights and that the defendants had refused to make any statement, the objection was sustained and the court advised the jury as follows:

"Ladies and gentlemen, the Fifth Amendment to the United States Constitution and a similar provision in the Constitution of California, gives every person the absolute right to refuse to make any statements that might tend to incriminate him, and he has no obligation whatever to talk, if he doesn't want to.

"In this instance I gather, Mr. Summers, the defendants indicated to you they did not want to talk, and you respected that right of theirs?

"THE WITNESS: That's correct."

Finally on recross-examination of Greterman the following occurred:

"[PROSECUTOR]: Q. When was the first time you related this story about a welshed bet to anybody, anybody other than your co-defendants? A. When is the first time I related it? Q. Yes. [DEFENSE COUNSEL]: Your Honor, I respectfully object to this. We might get into the area of confidential communication. THE COURT: Exclusive of your own attorney. THE WITNESS: Since—well, I didn't have time before the crime, before this incident. Q. [PROSECUTOR]: No, I am talking about after the crime. A. Oh, I don't know. I have, my wife and my brother-in-law, a few people like that. Q. Did you relate this story to any police officers? A. No. Q. They gave you an opportunity to talk to them, didn't they? [DEFENSE COUNSEL]: Your Honor, I would again request the instruction as to Miranda rights and his legal right to a jury. THE COURT: That is right. I assume when you were arrested the police told you that you were under no obligation to—THE WITNESS: No, they didn't. THE COURT: They didn't tell you that you had a right not to say anything? THE WITNESS: They did not—well, I was not read my rights until Mr. Summers, a day and a half later, read them to me. THE COURT: But anyway, you knew you had the right—THE WITNESS: Yes. They didn't—THE COURT: Not to talk, if you didn't want to? THE WITNESS: The officers did not try to question us or ask anything. Q. [PROSECUTOR]: And you didn't try to volunteer anything? A. No, I was not in a very comfortable position at the time. Q. You had a preliminary hearing, didn't you? A. Yes, I did. Q. Did you testify at this

preliminary hearing? A. No, I didn't. Q. You didn't tell your story then? A. No, I didn't. [DEFENSE COUNSEL]: Your Honor, may we approach the bench a minute please. I think we are getting into some dangerous areas. THE WITNESS: I do, too. [PROSECUTOR]: That was my last question, your Honor. THE COURT: Yes, and I don't think he is under any obligation to testify any time, if he doesn't want to. Let's finish the examination of this witness. We will talk about the rest of it after. [DEFENSE COUNSEL]: Thank you, your Honor. Q. [PROSECUTOR]: I take it you answered the question, no, you did not testify? THE COURT: Now just a minute. It is plain that I didn't want that question asked. [PROSECUTOR]: I am sorry, your Honor. I thought you wanted the final question. THE COURT: No, I don't. You are—[PROSECUTOR]: I am sorry. THE COURT: You are getting into trouble. [PROSECUTOR]: I have no further questions of this witness, as I indicated. [DEFENSE COUNSEL]: I have no questions of this witness, your Honor. THE COURT: You may step down. . . ."

The key instruction given to the jury concerning the only defense put forward read as follows: "There exists no intent to steal when a person intends only to take money from another which he *reasonably and in good faith* believes is rightfully his own. Such money need not be the identical currency or coins which such defendant so claims, but may not exceed the amount so claimed." (Our italics.)

The following instructions on the same subject, offered by the defense, were refused:

"When a party in good faith seeks the recaption of money lost by him at an illegal game, the intent to steal is lacking, for the law recognizes no title or right to possession in the winner."

"There exists no intent to steal or commit a felony when the owner in good faith intends to take his own property from the possession of another, even though the taking is under such circumstances as would constitute burglary if the possessor were the legal owner thereof."

"Where in defending a charge of burglary by showing that the intention was a recapture of money lost at an illegal game, it is not incumbent upon the defendant to prove that the money reclaimed was the identical money won from him, the accused must intend in good faith to retake his own property, and the question of intent is one for the jury."

## CONTENTIONS

On appeal Littleton, represented by new counsel appointed by us, contends that: 1. he and his codefendants were represented by the same,

privately retained, attorney; there was a conflict of interest between him and his codefendants and in the absence of advice of his right to separate representation, he did not waive that right; 2. the prosecutor committed misconduct in asking for and obtaining answers concerning the codefendants' failure to assert their defense before they testified thereto; and 3. that the jury was inadequately instructed on intent.

## DISCUSSION

We agree with all three contentions.

The Attorney General claims that any conflict of interest between Littleton and the codefendants was speculative. We disagree. ■ Littleton throughout the trial was in an entirely different position than his two codefendants. He could only be held liable as a principal on the theory that he aided and abetted the burglary. While he undoubtedly aided his codefendants, there was certainly a substantial question of fact whether he abetted, a term which includes knowledge of the wrongful purpose of his codefendants. (*People* v. *Dole*, 122 Cal. 486, 492 [55 P. 581].)

■ It is established and conceded that a good faith attempt to recapture money lost on an illegal wager is not theft. (*People* v. *Rosen*, 11 Cal.2d 147, 151-152 [78 P.2d 727, 116 A.L.R. 991].) ■ Littleton's good faith that was in issue was not a vicarious affair which depended on the good faith of his codefendants. (*People* v. *Smith*, 204 Cal.App.2d 797, 801-802 [23 Cal.Rptr. 5].)[1] It was quite possible that while Hansen

---

[1]In *Smith* the defendant was charged with rape, the People's theory being that she aided and abetted one Jenkins with respect to Jenkins' sexual relations with defendant's underage daughter. Her defense was that she believed in good faith that Jenkins and the girl were married. The opinion discusses this point as follows:

"Appellant next charges that the rulings of the trial court restricting evidence relating to appellant's state of mind; that is, her knowledge and belief as to the validity of the marriage, was error. With commendable frankness, the Attorney General has carefully analyzed the rulings in this respect and affirmatively arrives at the same conclusion. It seems clear to us that this is true. Knowledge and belief of appellant as to the validity or invalidity of the purported marriage was an essential question on the decision of appellant's guilt; an aider and abettor must act with knowledge, thus sharing in the criminal intent. (*People* v. *Le Grant*, 76 Cal. App.2d 148 [172 P.2d 554]; *People* v. *Wooten*, 162 Cal.App.2d 804, 810 [1-3] [328 P.2d 1040]; *People* v. *Hill*, 77 Cal.App.2d 287, 293-294 [3-4] [175 P.2d 45].)

"Where specific intent is an essential, as here, proof of absence of criminal intent is admissible. Thus, under some circumstances a mistake of law may be a good defense. (*People* v. *Rosen*, 11 Cal.2d 147, 150, 151 [2] [78 P.2d 727, 116 A.L.R. 991]; *Burke* v. *Watts*, 188 Cal. 118, 127 [6] [204 P. 578].) Presence or absence of motive is a circumstance bearing on guilt or innocence. (*People* v. *Moore*, 48 Cal. App. 245, 250, 251 [5] [191 P. 980]; *People* v. *Weatherford*, 27 Cal.2d 401, 423 [9] [164 P.2d 753]; *People* v. *Teitelbaum*, 163 Cal.App.2d 184, 215 [24] [329 P.2d 157]; *People* v. *Albertson*, 23 Cal.2d 550, 557 [1] [145 P.2d 7].) Questions as to the pleadings of Carol and Jenkins to appellant for permission to marry, their threats

and Greterman did indeed have discussions about bets in Littleton's presence which were either deliberate lies or drunken fantasies, Littleton believed them to be true. The defense, however, never zeroed in on that aspect of Littleton's case. Indeed, it would have been extremely awkward for the same attorney to put forward the discussions between Hansen and Greterman as expressive of the truth and to claim, at the same time on behalf of Littleton, that it did not really matter whether his other two clients were being truthful. Throughout the trial Littleton was pretty much the forgotten man. He was not called to testify. His presence during the planning stage at Raffles found its way into the record almost by accident. No instruction distinguishing his case from that of the codefendants was requested or given and, as we shall see, his interests were ignored in connection with the prosecution's claimed misconduct.

We need not decide whether the trial court's failure to advise Littleton of his right to separate representation is harmless error on the somewhat cynical theory that in view of the fairly sophisticated, though not speculative, nature of the conflict, none would have been asserted. At least one other error demands a reversal all by itself.

■ We have already quoted the instruction on good faith recapture of money believed to be the codefendants'. Together with that instruction the court gave the customary instructions on aiding and abetting.[2] The two instructions quoted in footnote 2, were the only ones peculiarly applicable to Littleton. While each contains the word "knowingly," neither stresses nor even hints at the law to the effect that Littleton was not answerable for his codefendants' knowledge, but only for his own. It is clear that by the time the instructions were given any conflict of interest which, as far as the court was concerned, may have been dormant at the outset of the trial, had become all too apparent. Although ordinarily it might have been the duty of Littleton's attorney to request instructions divorcing his client from the codefendants on the issue of knowledge, under the circum-

to marry without her consent if she did not grant permission; that Carol and Jenkins were the first to make proposals of marriage and not appellant; that appellant told Carol she would have to wait two years to be married, and that appellant wanted her to finish school, were all admissible on the question of motive and intent." (*People* v. *Smith, supra,* 204 Cal.App.2d at pp. 801-802.)

[2]CALJIC No. 3.00 "All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof."

CALJIC No. 3.01 "A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime."

stances of this case he could hardly be expected to do so and the least that the court should have done, on its own motion, was to instruct the jury on Littleton's position.[3]

We believe that the instruction that was given with respect to the defense sanctioned by *People* v. *Rosen,* 11 Cal.2d 147 [78 P.2d 727, 116 A.L.R. 991] put too heavy a burden on the defense. It speaks of a belief, held "reasonably and in good faith" that the alleged thief's money was his own. There is nothing in *Rosen* which justifies the imposition of a requirement that the good faith must be reasonable. Thus even if it could be argued that Littleton received whatever benefit the instruction extended to his codefendants—which we doubt—he did not receive the full measure which the law allows.

Since we feel that the errors in connection with the instructions require a reversal, we shall spend little time on the prosecutor's repeated misconduct in bringing out the codefendants' failure to have made prior statements consistent with their trial testimony. (*People* v. *Crawford,* 253 Cal.App.2d 524, 535 [61 Cal.Rptr. 472]; *People* v. *Conover,* 243 Cal.App.2d 38, 48-49 [52 Cal.Rptr. 172]; *People* v. *Reese,* 220 Cal.App.2d 143 [33 Cal.Rptr. 561]; *People* v. *Vienne,* 142 Cal.App.2d 172 [297 P.2d 1027].) Nor is it necessary to discuss the effect of defense counsel's partial failure to object. The matter will not reoccur at a retrial. We do, however, think it is appropriate to point out that here again the conflict of interest became apparent. Obviously defense counsel should have objected all the way down the line on behalf of all his clients and his objections should have been sustained. We do not know why he failed to do so. He may have thought that the evidence was admissible for impeachment of those defendants who were about to be or actually were witnesses, and that it might be futile to request an instruction that it be considered for impeachment purposes only. Given the erroneous premise, such reasoning is plausible as far as Hansen and Greterman are concerned. On the other hand it makes no sense whatever if we focus on Littleton, who never became a witness and against whom the evidence could only have been considered on the merits, though it should not have been.

This case is a good example of how a relatively simple and straight-

---

[3]We appreciate the difficulty in phrasing such an instruction in a way which would not have given the codefendants cause to complain. If the court had thought such difficulties to be insuperable, a solution would have been to invite a motion for a mistrial on behalf of Littleton, so that his case could be severed from that of the other two. (Cf. *People* v. *Massie,* 66 Cal.2d 899, 914-916 [59 Cal.Rptr. 733, 428 P.2d 869].)

forward prosecution can go awry when tried by an overzealous prosecutor and a defense counsel with divided loyalties.

The judgment is reversed.

Stephens, J., and Aiso, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 22, 1972.