[No. A098387. First Dist., Div. Four. Mar. 30, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MILTON LEWIS, JR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B., II.C. and II.D. of Discussion.

### COUNSEL

Renee E. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**KAY, P. J.**— ██ Appellant Milton Lewis, Jr. was convicted by a jury of two counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)), and with personal use of a firearm (Pen. Code, § 12022.5, subd. (a)). He was sentenced to 22 years and 4 months in prison. In this appeal, he raises issues of prosecutorial misconduct, and *Wheeler* (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) and instructional error. In the published portion of this opinion, we hold that the prosecutor did not commit misconduct by referring in questioning and argument to appellant's failure to request an *Evans* (*Evans v. Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681]) lineup. We conclude that the other claims of error also lack merit and affirm the judgment.

## I. BACKGROUND

The assaults took place around 2:00 a.m. on December 16, 2000, in the parking lot of a Denny's restaurant in Eureka. The assailant hit David Moore in the neck with a gun (count one), and fired two shots in the direction of Keenin Ephriam, Cameron Matthews, Delvin Hudson, and Lawrence Bady (count two). Over 15 witnesses at the scene testified to what transpired. The issue in the case was whether appellant was the assailant.

Ephriam, Matthews, Hudson and Bady, students at Humboldt State University (HSU), went to Denny's in Ephriam's gold Sentra. HSU students Moore

and Timothy Hair went there with Keion Morgan in Morgan's green Civic. Before the Civic and Sentra arrived at Denny's, a group of appellant's friends and acquaintances had gathered there, including: Tyvonne Latimer, Jacoby Achane, Donald Bell, Palavi Vainuku, Mo Charlo, Porsche Charlo, Emily Petra, Dee Dee Prudhomme, and Yolanda George. Everyone was coming from Club West, which had closed at 1:00 a.m. Appellant, who was known as "J.R.," went to the club with Latimer, Achane, and Bell in a white Altima rented to Achane's mother. George testified that appellant went to Denny's with Porsche, Petra, Prudhomme, and her in Prudhomme's van. George said that she sat on appellant's lap during the trip, and felt something hard, like a gun, in his waistband. She turned and looked at the object and saw something shiny.

Ephriam had an argument with appellant outside the club after it closed. Ephriam denied at trial that appellant threatened to "blow [his] brains out" during the argument, but acknowledged reporting words to that effect to the police on the night of the incidents. The argument between Ephriam and appellant was followed by a fistfight between Ephriam's friend Matthews and appellant's friend Porsche, which the police broke up. Eureka Police Officer James Jones saw appellant near the club when he was dispatched to the disturbance, and reported later that night that appellant had his hair in cornrows, and was wearing a red short-sleeved shirt and dark baggy pants.

Morgan drove the Civic to Denny's with Moore in the passenger seat and Hair in the back. Morgan stopped the car in the middle of a group of people in the parking lot to talk to Porsche. Moore testified that a man came around to his side of the car, opened the door, pulled out something shiny that appeared to be a gun, and hit him with something on the neck. Morgan told Eureka Police Detective David Parris later that night that the assailant had asked, "Was it one of you all who did it?" and pulled a chrome handgun out of his waistband and hit Moore with it. Moore lunged toward the driver's side of the car after he was hit and, according to a taped statement given by Vainuku, asked Porsche to "tell him it wasn't us." In his statement, Vainuku said that Porsche was angry and grabbed appellant; people were telling appellant to put the gun away, but Achane said, "let his ass go to jail." In his taped statement, Mo said that a green car pulled into the parking lot, and he saw appellant, who appeared to be drunk, walk up to the car and pull out a gun. Mo saw the man in the passenger seat jump to the other side of the car, but did not see appellant hit the man with the gun.

When they were interviewed by Parris later that night, Moore, Hair and Morgan were shown two six-photo lineups: appellant was pictured in photo

two in lineup one; Latimer was shown in photo two in lineup two. Latimer testified that people often confuse him with appellant, especially when their hair is braided.[1] Moore testified that he did not see his assailant's face. Moore identified Latimer as the assailant from the photo lineups, and told Parris that he had seen his assailant get into the white Altima at the club. Hair did not identify either appellant or Latimer from the photo lineups; he thought that the man depicted in photo six in one of the lineups resembled the assailant. Morgan identified appellant as the assailant from the lineups but declined to identify him in court. Morgan described appellant at trial as a "changed man," and testified that appellant was not the one who assaulted Moore.

After the assault on Moore, Morgan drove out of the parking lot toward the police station next to the restaurant. Ephriam saw Morgan's car leaving the lot as he was driving in. In her interview with Parris a few days after the incidents, Prudhomme said that when the gold car pulled into the other end of the lot, she tried to calm appellant down and hold him back. In their statements, Mo and Vainuku said that when the other car arrived, everyone pointed and said "there they are," "that's them." Ephriam recognized the man he had argued with at the club; people tried to hold the man back, but he broke away and walked toward Ephriam, Hudson, Bady, and Matthews as they were getting out of the car.

Ephriam testified that the man pulled out a silver gun and fired two shots; two .40-caliber shell casings were recovered by the police at the scene. Hudson testified that the man who had argued with Ephriam at the club came toward them and fired at them from the middle of the Denny's lot. Bady testified that when they got to Denny's he saw the men who had argued and fought with Ephriam and Matthews at the club, and that he heard shots as he was getting out of the car. Matthews testified that the men from the club were walking toward them, and that he was bent over, putting his shirt in the car prepared to fight again, when he heard the shots, so he did not see who fired the gun. In his statement, Mo said that he watched from close range as appellant pulled out a gun, ran toward the people in the car, and fired twice, pointing the gun straight toward the vehicle. In his statement, Vainuku said that appellant walked over, pulled out a gun, fired twice, and tried to fire again but the gun jammed.

Ephriam and Hudson identified appellant from the photo lineups and in court as the shooter. Bady and Matthews, who did not see the shots fired, identified appellant from the photo lineups as the man who had argued with

---

[1] In the lineup photos, appellant's hair is braided and pulled back off his face and behind his head, while Latimer's hair is braided and falling to the side and over his face.

Ephriam. Matthews "guaranteed" that he could identify the assailant when he saw the photo lineup, and reiterated his identification of appellant at trial. Bady stood next to Ephriam during the argument with appellant; he and Hudson testified that they got a good look at appellant at that time. Ephriam testified that he stood a foot and a half away from appellant during the argument, in an area illuminated by street lamps.

In court or in their interviews with Parris, Ephriam, Hudson, Bady, and Matthews said that appellant had his hair braided and was wearing a red shirt on the night of the incidents. Tracy Gothier, a Eureka police dispatcher, was working at the police station next to Denny's at 1:51 a.m. that night when she heard shots and went to her second story window overlooking the well-lit restaurant parking lot. She testified that there were many people out in the lot, and that she observed a slender African-American man with braided hair in a baggy white sweatshirt standing by a car holding a silver gun.[2] She broadcast a report of a shooter wearing a white sweatshirt.

When the shots were fired, Matthews dove into the back seat of the Sentra, and Ephriam, Hudson, and Bady ran out of the parking lot toward the police station. Hudson reported to Parris that when he got to the police station and looked back, he saw their assailant get into and out of the white Altima in the Denny's lot. In his statement, Vainuku said that people were telling appellant to "get out of [t]here," and that he saw appellant leave the scene. Hair, riding with Morgan and Moore, saw Ephriam, Hudson, and Bady running down the street; Morgan picked them up and they returned to the Denny's lot.

Officer Todd Wilcox arrived at Denny's looking for an African-American male in a white sweatshirt, but based on descriptions of the shooter at the scene, started looking for someone with cornrows wearing a red shirt and red shoes. Ephriam, Matthews, and Hudson reported that night that the assailant wore a red shirt, red shoes, and blue jeans. They and Bady described the assailant as a man in his 20's, 5'7" to 5'10"; Matthews said that the man was thin, and Bady estimated that he weighed 160 pounds. Morgan thought that the assailant was 5'7" and 145 pounds; Moore said that the assailant was 5'9" or 5'10" and 160 pounds, and that he was wearing a red shirt, long red jacket, and jeans; Hair described the assailant as a 19 or 20 year old wearing a red shirt. When Petra was interviewed a few days after the incidents, she recalled that appellant wore a red shirt and blue jeans that night. Appellant is 5'10" and weighed 145 pounds when he was taken into custody a month later.

---

[2] Gothier, like Ephriam, Bady, and Matthews, testified that the shooter's braids were pulled back off his face.

In her interview, Petra said that Latimer wore a red and beige plaid shirt and a jeans jacket that night, and she testified at trial that he usually wears braids. Wilcox questioned a man at Denny's in cornrows and a red shirt and shoes; the man was wearing a wide-striped shirt under a black jacket. The man had a Hertz key ring and no identification. Wilcox let the man go without getting his name because the assailant was described as someone wearing a solid red shirt. At trial, Achane recalled the police interviewing Latimer at Denny's. Latimer testified that the police frisked him, said "you're J.R.," and then let him go. Latimer told Parris that he had worn a "shiny dark outfit" and red tennis shoes that night; he could not re member at trial whether his hair had been braided. Latimer testified that he did not have a gun that night and denied committing the assaults.

Officer Wilcox testified that he had contact with appellant several months after the incidents, in August 2001, when he went to appellant's house to investigate a vandalism. He said he recognized appellant on that occasion as the man in the striped shirt he had questioned at Denny's. When Wilcox later saw appellant's photo lineup, he told Parris he recalled talking to appellant that night, and he prepared a supplemental report of the encounter after reporting it to Parris. Although Wilcox was "100 percent confident" that he had questioned appellant at Denny's, the prosecution argued that he had talked to Latimer, not appellant.

The man Wilcox questioned at Denny's said that his Hertz ring was for keys to a friend's car. He said that he had been the designated driver, and had gotten the keys from Petra. Petra had the keys that matched the ring, but refused to tell Wilcox who gave them to her. Achane told Wilcox that he had given Petra the keys to roll up the windows on his mother's white Altima. Latimer and Achane said that Latimer drove Bell and them to Denny's in Achane's car; Achane said he had been too drunk to drive.[3] Achane testified that he drove appellant, Latimer and Bell to the club, but that appellant was "goin' out of town" and did not go with them to Denny's. An identification card with Latimer's name and photo was found near the Altima; appellant's fingerprints were found in the Altima on the driver's side back door.

Parris went to an address in Eureka to arrest appellant on January 10, 2001, but appellant was not there. Shortly after Parris returned to the police station

---

[3] When Achane was interviewed at the scene he said that he had driven to Denny's alone. Although Achane, a convicted felon, insisted at trial "I'm a honest dude," Parris said that he had interviewed Achane many times, and that when Achane's "mouth's moving, he's lying." When Parris was asked by defense counsel whether others involved in the case had lied to him in the past, Parris said that appellant, Latimer, Bell, and Porsche were liars, but that Mo and George were not.

that day he received a phone call from appellant. Part of the conversation was taped and the tape was played for the jury at trial. Appellant told Parris that he had been in Pittsburg, California on the night of the incidents. Parris urged appellant to turn himself in, but appellant hung up the phone and did not surrender. Appellant was apprehended in Richmond, California on January 24, 2001; he did not have any identification when he was arrested, and told the officer that his name was Michael Lawson, Junior.

At trial, none of appellant's friends identified him as the assailant. Latimer said that he did not see appellant at the club or at Denny's. Achane, as has been noted, said appellant went to the club but not to Denny's. Bell said he went with appellant, Achane, and Latimer to the club, but he had a lot to drink at the club and could not remember what happened after it closed. Porsche told Parris that appellant had been angry and "acting stupid" at Denny's. At trial, Porsche did not remember seeing appellant at Denny's. He said he lied to Parris, and told him what he wanted to hear. Petra saw appellant at the club, but not at Denny's. Prudhomme saw appellant at Denny's, but did not remember seeing him in the parking lot. George heard shots at Denny's, but did not see anyone there with a gun. Vainuku and Mo gave statements incriminating appellant, but at trial could not remember anything that happened at Denny's. The prosecutor dubbed it "the case of the fortuitously forgetful friends."

Parris was questioned at some length about the procedures he used with the photo lineups. He said that it was his practice not to put suspects together in the same lineup. He would create a separate lineup for each suspect, grouped with people with similar features who the witnesses did not know. Parris did not prepare photo lineups for Achane or Porsche because he did not regard them as suspects. The lineups for appellant and Latimer consisted of prior booking photos. Parris knew that his photo of Lattimer was an old photo, but he thought it was a "good likeness" and said he did the best he could with what he had to work with that night. "I was in a position at that time at the early morning hours," Parris explained, "to use what I had in front of me. When I was going to be able to get back with these kids was unknown. I knew many of them lived out of town. I had a lineup that was given to me that I probably wasn't completely happy with. But I had to make use with what I had. And, of course, I didn't have another photo of Tyvonne to put into a lineup. So I used what I had and showed it."[4]

---

[4] As has been indicated, an identification card with Latimer's photo was recovered at the scene. It is unclear whether that photo was more current than the one used in the lineup or whether it could have been incorporated into the lineup; nothing was made of those matters at trial. The witnesses who "lived out of town" were apparently the HSU-student victims (e.g., Ephriam and Moore were from Los Angeles, Bady was from Vacaville); appellant and his friends were evidently locals (Parris said that he was familiar with all the potential suspects,

Latimer's hair was not in cornrows when Parris took his picture two days after the incidents. Parris did not, "for fear of confusion," show a new lineup with the more recent photo of Latimer to anyone who had viewed the prior lineups. "If I show them the second lineup," Parris said, "there's always that possibility that they may direct their attention towards the individual because now they're seeing a second photo in a second lineup of . . . the same individual I've had earlier. So it can . . . taint that identification." At trial, Parris was shown a Department of Motor Vehicles photo of Latimer in cornrows taken two weeks before the incident. Parris admitted that Latimer "actually look[ed] a little bit like" appellant in that photo, but he did not consider it a good picture of Latimer, and could not have used it on the night of the incidents because DMV photos take several days to obtain.

Parris questioned Petra, Moore, Morgan, Hair, Bady, Matthews, Ephriam, and Hudson, in that order, at the police station that night. Parris did not show the lineups to Petra because they had not been completed before her interview concluded. Parris showed Moore, who identified Latimer as the assailant, lineup two (with Latimer) first, and lineup one (with appellant) second. The others—who, aside from Hair, all identified appellant as the assailant—were shown lineup one (with appellant) first, and lineup two (with Latimer) second. When Parris was asked whether Moore was the only one shown Latimer's lineup first, he answered, "That could be. Actually, it never came to my attention. But now that you mention it, yes, I guess that's true. They [the witnesses other than Moore] might have been shown 1 versus 2 first I—I don't recall. But now that you mention it, yes, that could very well be."

After Vainuku and Mo implicated appellant in the assaults, Parris showed them appellant's lineup to confirm that they were talking about him; Parris did not think it was necessary to show them both lineups because they knew appellant well and had identified him by name. Parris did not conduct a live lineup with appellant after his capture because he was satisfied with the identifications from the photo lineups.

Ephriam, Vainuku, and George said they were testifying only because they had been subpoenaed. When asked whether his testimony made him concerned for his safety, Ephriam said, "You always got to be concerned for your safety, period." Vainuku said that his father had advised him against testifying. When asked if she felt anything unusual when she was going to Denny's on appellant's lap, George replied, "Do I have to answer that question?"

---

and that Vainuku and Mo had grown up with appellant; Mo called appellant a "neighborhood kid"; Achane's mother said that the "whole clan"—appellant, Latimer, Bell, Porsche, and Mo—were like sons to her, etc).

When asked about his reactions to the shots in the parking lot, Latimer remarked, "[T]hings like that don't happen out here. We don't live in the city. So I'm not—I don't got nothin' to be scared of like that."

The evidence was presented in 11 half-day court sessions; the jury deliberated less than three hours before rendering its verdicts.

## II. DISCUSSION

A. *Questions and Comments on Appellant's Failure to Request a Lineup*

Appellant contends that the prosecutor committed misconduct in the questioning of Detective Parris and in closing argument by referring to appellant's failure to demand a live lineup. (See *Evans v. Superior Court, supra,* 11 Cal.3d at p. 625 [lineup may be ordered on defense motion].)

(1) *Record*

After Parris was cross-examined on his lineup procedures, the prosecutor asked him, "Now, you are aware, were you not, that prior to the time of the preliminary hearing, the defendant is entitled to demand a live lineup?" When Parris said, "yes," the prosecutor asked whether appellant had made any such demand. Before Parris could answer, defense counsel objected that this questioning "unfairly shifts the burden," and "is akin . . . to a *Doyle* error." (*Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] [prohibiting use of defendant's postarrest, post-*Miranda* silence to impeach the defense case].) Counsel moved to strike, and asked for the jury to be admonished "that what the defendant says or does [in his defense] is not admissible." After the jury was excused, counsel reiterated his objection that the questioning was "tantamount to *Doyle* error." The prosecutor argued that the questioning was proper because it concerned appellant's appearance, rather than his testimony, and thus did not involve his right to remain silent. The prosecutor submitted that he could comment on appellant's failure to produce relevant evidence. The objection was overruled, the motion to strike was denied, and there was no further examination on the subject.

The defense maintained in closing argument that Latimer had committed the assaults, and that the identifications of appellant were suspect because the photo lineups were tainted. Defense counsel noted that appellant was the only one in the photos who matched the descriptions of the assailant as someone with braids tied back. (See fns. 1 and 2, *ante.*) He argued that only one lineup, with appellant's photo and a recent photo of Latimer, should have

been used. He also observed that the defense did not "need to prove anything."

The prosecutor responded, without objection, that "we know from Detective Parris, you know, that the defendant has a right to a live lineup. Bring the witnesses in, see them in the flesh. You don't have to—there's some concern about the validity of the identification. You have a right to that. No such lineup was ever requested. Parris didn't put one on because Parris was satisfied with the—with the accuracy of the identifications that he had. No need for it. This—this kind of argument where you're saying that you've got a tainted lineup and all of this is something that could have been cleared up early on and wasn't, that's akin to me—to like the Mendes (sic) brothers who killed their parents and then come into court and say: 'Feel sorry for me because I'm—I'm an orphan.'"

### (2) *Analysis*

■ Appellant renews his claim that the questioning and argument about his failure to demand a lineup was "akin" to error under *Doyle v. Ohio, supra,* 426 U.S. 610, which prohibits the prosecution from exploiting a defendant's post-*Miranda*-advisement silence. Since *Miranda* warnings implicitly indicate that the defendant's silence will not be used against him, it is unfair to use that silence to impeach the defense at trial. (*People v. Earp* (1999) 20 Cal.4th 826, 856 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1092 [73 Cal.Rptr.2d 203].) *Doyle* error can occur either in questioning of witnesses or jury argument. (*People v. Evans* (1994) 25 Cal.App.4th 358, 368 [31 Cal.Rptr.2d 20].) A single unanswered question may constitute *Doyle* error if the question improperly refers to the defendant's silence and a defense objection to the question is erroneously overruled. (*Id.* at p. 369.)

Appellant also renews the argument that questioning and comment on his failure to request a lineup improperly shifted the burden of proof in the case—an error, he submits, "akin" to that under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], which prohibits the prosecution from exploiting the defendant's failure to testify at trial. (See generally *People v. Brown* (2003) 31 Cal.4th 518, 554 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [stating *Griffin* rule]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1338–1340 [65 Cal.Rptr.2d 145, 939 P.2d 259] [rejecting claims of *Griffin* error and impermissible burden shifting]; *People v. Austin* (1994) 23 Cal.App.4th 1596, 1611 [28 Cal.Rptr.2d 885], disapproved on another point in *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867 [103 Cal.Rptr.2d 13,

15 P.3d 234] [observing that *Doyle* and *Griffin* both involved attempts to take unfair advantage of the defendant's silence].) Appellant cites several basic jury instructions (which were given in this case) in support of this argument. (CALJIC Nos. 2.90 [the defendant is presumed innocent; the prosecution bears the burden of proof], 2.60 [no inference can be drawn from the defendant's failure to testify], 2.61 [the defendant may choose to rely on the state of the evidence in deciding whether to testify; no lack of testimony on the defendant's part makes up for the People's failure of proof].)

It has long been established that "although *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' " (*People v. Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959]; see 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 575, pp. 822–823 [collecting cases].) Thus, "[a]s a general principle, prosecutors may allude to the defense's failure to present exculpatory evidence" (*People v. Guzman* (2000) 80 Cal.App.4th 1282, 1289 [96 Cal.Rptr.2d 87]), and such commentary does not ordinarily violate *Griffin* or erroneously imply that the defendant bears a burden of proof (e.g., *People v. Bradford, supra,* 15 Cal.4th at pp. 1338–1340; *People v. Ratliff* (1986) 41 Cal.3d 675, 690–691 [224 Cal.Rptr. 705, 715 P.2d 665]). *Griffin* and *Doyle's* protection of the right to remain silent is a "shield," not a "sword" that can be used to "cut off the prosecution's 'fair response' to the evidence or argument of the defendant." (*People v. Austin, supra,* 23 Cal.App.4th at p. 1612, quoting *United States v. Robinson* (1988) 485 U.S. 25, 32 [99 L.Ed.2d 23, 108 S.Ct. 864].) Questions or argument suggesting that the defendant did not have a fair opportunity to explain his innocence can open the door to evidence and comment on his silence. (*People v. Austin, supra,* at pp. 1612–1613.)

Here, alleged deficiencies in the police lineups were a centerpiece of the defense case. Defense counsel asked numerous questions of Detective Parris seeking to impugn the procedures he employed with the photo lineups. Counsel argued to the jury that the two lineups Parris used were inappropriately suggestive, and that witnesses should have been shown a third lineup with a photo of appellant and a more recent one of Latimer. The prosecution could properly respond to those criticisms by showing that appellant did not pursue a potential remedy: he could have requested a live lineup that might have eliminated his professed concerns. (See *People v. Green* (1979) 95 Cal.App.3d 991, 1004 [157 Cal.Rptr. 520] [defendant concerned with suggestive identification has "readily available remedy" of demanding pretrial lineup].) Questions and arguments about appellant's ability to make such a

request permissibly referred to his failure to develop exculpatory evidence; they were not aimed at the exercise of his right to remain silent and were not likely to be understood by the jury as reflecting on that right. (See *People v. Guzman, supra,* 80 Cal.App.4th at p. 1289; e.g., *People v. Brown, supra,* 31 Cal.4th at p. 554 [comments merely emphasized failure to present material evidence and did not seek to capitalize on the failure to testify]; *People v. Lewis* (2001) 25 Cal.4th 610, 670–671 [106 Cal.Rptr.2d 629, 22 P.3d 392] [remarks did not expressly or impliedly refer to invocation of right to silence and would not have been so understood]; *People v. Morris* (1988) 46 Cal.3d 1, 36 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5, 545, fn. 6 [37 Cal.Rptr.2d 446, 887 P.2d 527] [no indirect reference to failure to testify].)

■ Appellant maintains that there was no right to comment on the failure to produce material evidence or call logical witnesses in this instance because "the logical witness he did not call was *himself.*" It may be *Griffin* error to argue to the jury "that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford, supra,* 15 Cal.4th at p. 1339.) However, there is no such error when the prosecutor refers to a lack of proof "which might have been presented *in the form of physical evidence* or testimony other than that of defendant." (*Id.* at p. 1340, italics added.) Here, the questions and comments involved appearance in a lineup, a form of "nontestimonial, physical evidence" outside the privilege against self-incrimination protected by *Griffin* and *Doyle.* (*People v. Johnson* (1992) 3 Cal.4th 1183, 1221–1222 [14 Cal.Rptr.2d 705, 842 P.2d 1]; *People v. Williams* (1977) 68 Cal.App.3d 36, 45 [137 Cal.Rptr. 70], disapproved on another point in *People v. Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927]; *People v. Austin, supra,* 23 Cal.App.4th at p. 1611; see also *People v. Preston* (1973) 9 Cal.3d 308, 315 [107 Cal.Rptr. 300, 508 P.2d 300] [permitting comment on defendant's "nonassertive conduct prior to trial" if conduct is not an exercise of the Fifth Amendment privilege].) ■ Because lineups do not implicate the right to remain silent, *Griffin* and *Doyle* do not prohibit comment on refusal to participate in a lineup (*People v. Johnson, supra,* 3 Cal.4th at pp. 1221–1222) or, in our judgment, on failure to request one. Accordingly, the *Griffin-Doyle* objection was correctly overruled.

Appellant contends that a different conclusion is required under *People v. Lindsey* (1988) 205 Cal.App.3d 112 [252 Cal.Rptr. 96], and *People v. Conover* (1966) 243 Cal.App.2d 38 [52 Cal.Rptr. 172], but those cases are inapposite. In *Lindsey,* the prosecutor committed *Doyle* error by arguing to the jury that defense counsel should have revealed the defendant's alibi

defense prior to trial. (*People v. Lindsey, supra,* at pp. 116–117.) As we have explained, no *Doyle* error was committed here. *Conover* held that it was misconduct for the prosecutor to comment on the defendant's failure to call a witness at the preliminary hearing because the defendant's guilt was not at issue in that proceeding. (*People v. Conover, supra,* at p. 49.) Appellant argues that the same kind of misconduct occurred in this case because the questions to Parris concerned the right to demand a lineup "prior to the time of the preliminary hearing." Here, however, the reference to proof prior to the preliminary hearing did not necessarily imply that appellant was obliged to introduce evidence at that hearing; the question merely reflected the usual timing of an *Evans* motion. (See *Evans v. Superior Court, supra,* 11 Cal.3d at p. 626 [motion for a lineup should be made as soon as practicable after arrest or arraignment]; *People v. Burke* (1980) 102 Cal.App.3d 932, 942, fn. 7 [163 Cal.Rptr. 4]; Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 6th ed. 2002) § 19.17, p. 484 [defendant must generally decide before the preliminary hearing whether to request a lineup].)

Appellant notes that *Evans* motions are not automatically granted (see *Evans v. Superior Court, supra,* 11 Cal.3d at pp. 625–626 [factors to be weighed in ruling on the motion]), and submits that the questions and arguments about the lineup were improper insofar as they created the erroneous impression that he had an absolute right to a lineup upon request. However, no objections were made on that ground below (Evid. Code, § 353, subd. (a) [waiver of objections to evidence]; *People v. Williams* (1997) 16 Cal.4th 153, 220–221 [66 Cal.Rptr.2d 123, 940 P.2d 710] [waiver of objections to argument]), and even if counsel could be deemed incompetent for neglecting to make such objections, appellant was not prejudiced by those failures (*People v. Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]). It is not reasonably probable that the outcome would have been different if the jury had learned that a defense motion for a lineup could have been denied; the central point—that appellant never even *tried* to pursue that potential remedy despite his alleged concerns with the police lineups—would have remained.

■ Appellant argues that the prosecutor also committed misconduct by likening his failure to request a lineup to the Menendez brothers' notorious murders of their parents. (*Menendez v. Superior Court* (1992) 3 Cal.4th 435 [11 Cal.Rptr.2d 92, 834 P.2d 786].) While the gravity of appellant's omission was hardly comparable to that of the Menendez brothers' acts, the (strained) logic, presumably, was that defendants should not benefit from problems (tainted identifications, having been orphaned) they themselves created (by failing to move for a lineup, by killing their parents). Prosecutors are permitted to make vigorous, colorful arguments with obvious hyperbole like

that used here (see *People v. Williams, supra,* 16 Cal.4th at p. 221; *People v. Visciotti* (1992) 2 Cal.4th 1, 81, fn. 44 [5 Cal.Rptr.2d 495, 825 P.2d 388]), and there is no reasonable likelihood the jury would have confused appellant's case with that of the Menendez brothers (see *People v. Cunningham* (2001) 25 Cal.4th 926, 1002 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Ochoa* (1998) 19 Cal.4th 353, 427 [79 Cal.Rptr.2d 408, 966 P.2d 442]). Thus, while the comparison seems inapt, it did not rise to the level of misconduct. ▪ Further, because an admonition to ignore the argument would have cured any possible harm, any error as to the argument was waived by the failure to object and request an admonition. (*People v. Riel* (2000) 22 Cal.4th 1153, 1212–1213 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Wharton* (1991) 53 Cal.3d 522, 566 [280 Cal.Rptr. 631, 809 P.2d 290].) Defense counsel could have reasonably decided to forgo the objection to avoid highlighting the argument; thus, contrary to appellant's claim, there was no incompetence of counsel on that score. (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Padilla* (1995) 11 Cal.4th 891, 940 [47 Cal.Rptr.2d 426, 906 P.2d 388], disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *People v. Wharton, supra,* at p. 567.)

B.–D.[*]

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## III. CONCLUSION

The judgment is affirmed.

Reardon, J., and Sepulveda, J., concurred.

A petition for a rehearing was denied April 19, 2004, and appellant's petition for review by the Supreme Court was denied June 30, 2004.

---

[*]See footnote, *ante,* page 246.