Filed 3/3/14  P. v. Pacheo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056825 |
| v. | (Super.Ct.No. INF063631) |
| ANTHONY PACHECO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Honorable Charles Everett Stafford, Jr., Judge.  Affirmed.

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Anthony Pacheco was convicted of second degree murder (Pen. § 187, subd. (a)) and assault on a child under eight years of age causing death (§ 273ab). The trial court sentenced him to 25 years to life in state prison. He appeals, contending the prosecutor committed misconduct and he received ineffective assistance of counsel.

## I. FACTS

Because defendant does not raise any challenge to the sufficiency of the evidence, only those facts necessary to address his issues on appeal will be provided.

In October 2008, defendant was living in Indio with his mother (Felinda Pacheco), his brother (Kevin Barkley), his daughter, and his girlfriend (I.W.) and her two children (A. and Mya). In the morning of October 21, 2008, firefighters responded to a 911 call and found 17-month-old Mya in life-threatening distress. Defendant was present and seemed unnaturally calm. He told the firefighters that Mya just "woke[] up that way." Mya was transported to the hospital and later airlifted to Loma Linda Children's Hospital.

Dr. Amy Young, forensic pediatrician at Loma Linda Children's Hospital, observed bruising and swelling on Mya's forehead, bruising on the left side of her head, shins, chest, abdomen, ear, tongue and frenulum. She had sustained a tear to her upper frenulum, lacerations to her lower inner lip, and "global injury" to her brain caused by blunt force trauma consistent with a "major motor vehicle accident event" or shaking. Mya also had numerous retinal hemorrhages consistent with "repeated" blunt force trauma, which Dr. Young opined were injuries one would expect to see from "repeated -- multiple incidents of blunt force trauma . . . the same as repetitive acceleration

2

deceleration, meaning head movement, sudden moving and sudden stopping," such as a baby forcibly striking a wall repeatedly. The doctor also stated that Mya's symptoms would have immediately followed her injury. Despite efforts to save her, four days after being brought to the hospital, Mya died from brain injuries.

Detective Erik Longoria of the Indio Police Department interviewed defendant. During the interview, defendant claimed that he found Mya on the floor with her eyes "rolling in the back of her head" and her tongue protruding from her mouth. He explained that previously, Mya had gotten into a fight with a two-year-old girl who hit Mya over the head with a hairbrush, causing Mya to feel sick and throw up. Defendant added that Mya liked to "hit her head with her mop" or the wall when she became mad. He said "she hits her head a lot." When the detective indicated his suspicions that there was more to the story, defendant remembered he accidentally bumped Mya's head on the corner of the bed when he picked her up. He later added that Mya had "slipped on a toy" and "hit the wall and slid down." Defendant also confessed to playing a little rough with her and that he "might have . . . hit her head." In a later interview with Detective Longoria on October 23, 2008, defendant remembered that when he had been carrying Mya in the hallway, he had accidentally "kicked" a toy, then "tripped," and then "slipped" and "dropped" Mya.

At trial, defendant testified that what he had told Detective Longoria was false. He claimed that I.W. left the house in a hurry on the morning of October 21, 2008. When she came to the hospital, she "just told [defendant] she was sorry." When he asked her what she was sorry for, she "kept saying, 'This morning, this morning.'" I.W. said she

3

did not want to get in trouble and she could not lose her girls. Defendant did not know if I.W. had hurt Mya,[1] but "from the answers she was giving [him], she was starting to scare [him]." Defendant said he loved I.W. and tried to protect her by "[making] stuff up." He claimed that when he spoke with the detectives, he invented a story for them. According to the story, he had accidentally hit Mya's head on the bed frame even though he did not know that she had a head injury; he was just guessing. After two years in jail, defendant asked I.W. to come to court and tell the truth. She said that she would, but then she did not. Defendant had not seen her since that conversation in jail and believed she was living on a reservation in Arizona.

On cross-examination, defendant agreed that he had told many lies. Although he had lied to the police, he claimed he was now being truthful. When asked how one could tell when he was lying and when he was not lying, defendant stated, "I don't know." When the prosecutor asked defendant to explain why he had asked Detective Longoria if he (defendant) could tell I.W. that he had hurt Mya, defendant replied, "[s]o she wouldn't be pressured into answering [the detective's] questions." Defendant testified that he believed he had to lie for I.W. to protect the other children from being taken by authorities. The prosecutor noted the children were already being taken by authorities when defendant was telling lies and asked defendant why he did not tell the truth then. Defendant said, "To keep [I.W.] from sitting in the place that I was sitting in." He later added, "I don't know. I was still trying to protect [I.W.]." Likewise, the prosecutor

---

[1] I.W. never told defendant that she hit Mya.

4

asked defendant why he did not tell the truth during his postarrest interview, defendant said that he kept lying because he did not want I.W. to get in trouble. Defendant believed that he had been arrested for lying. The fact that he had been charged for Mya's condition "came as a complete surprise" to him. Nonetheless, he elected to keep lying because he thought "what good would it have done the kids with both of us in jail[.]" He testified that he told his lawyer the truth.

On recross-examination, after noting that a year and a half had passed between I.W.'s visit to the jail and defendant's trial, the prosecutor asked defendant to explain why he failed to alert authorities about I.W.'s statements to him during that time period. Defendant responded that he had told his trial counsel and commented that he was unable to prove that I.W. committed wrongdoing.

Defense counsel failed to object to the prosecutor's questioning on grounds of prosecutorial misconduct or error under *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).[2]

## II. PROSECUTORIAL MISCONDUCT

As noted above, defendant's early statements to the investigating officers described various possible ways that Mya received her head injuries. They included

---

[2] Defense counsel's sole objection was based on the attorney-client privilege. After defendant testified that he told his lawyer about I.W.'s statements to him, and the prosecutor asked why he did not tell the police, defense counsel objected as follows:

"[DEFENSE COUNSEL]: Objection to this line of questioning. Once he talks to his lawyer, about that line of questioning.

"THE COURT: I think the last question was why didn't you tell the police.

"[DEFENSE COUNSEL]: Move to strike as to the talking to the lawyer.

"THE COURT: That wasn't the question; that was the answer that he told you. The objection is overruled. [¶] You may proceed."

5

another child hitting her over the head with a hairbrush, Mya self-inflicting the injuries, and defendant possibly causing her to hit her head. Contrary to these statements, at trial defendant testified that I.W. had said things to him at the hospital suggesting she had inflicted the fatal abuse upon Mya. Defendant testified that I.W. came to see him while he was in jail and said she would testify at trial and tell everyone what really happened. The prosecutor cross-examined defendant about how his trial testimony significantly differed from his statements to the detectives. Specifically, the prosecutor asked why defendant had not told the detectives about his suspicions of I.W. or her statements to him while he was in jail.

On appeal, defendant contends the prosecutor committed misconduct in questioning him about his postarrest silence, and the questions violated his rights under *Doyle*.

We conclude it was proper for the prosecutor to cross-examine defendant about the inconsistencies between his trial testimony and his prior statements in the police interviews and to argue the reasonable inference of recent fabrication from that evidence. Moreover, defendant waived his *Doyle* claim and any related claim of prosecutorial misconduct.

### A. Forfeiture

An objection to the prosecutor's questions in the trial court which does not specify the issue raised on appeal forfeits the claim for appellate review. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 318; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 199.) Likewise, the failure to object to prosecutorial misconduct grounds

6

forfeits a misconduct claim for purposes of appeal. (*People v. Foster* (2010) 50 Cal.4th 1301, 1350-1351.)

At trial, defense counsel's sole objection was based on defendant "talking to the lawyer." Because there was no objection on *Doyle* grounds, the issue is forfeited. (*People v. Tate* (2010) 49 Cal.4th 635, 691-692.)

Defendant also cites the prosecutor's closing arguments before the jury as *Doyle* error.[3] However, defendant did not object or request any curative admonitions. Failure to object to prosecutorial misconduct in the trial court and seek a curative admonition forfeits the claim for appeal unless such an objection or request would have been futile. (See *People v. Silva* (2001) 25 Cal.4th 345, 373.) "'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 800.) Having deprived the trial

---

[3] "[Defendant], who started this story with a series of lies, continued with you yesterday. [¶] The lie that he came up with yesterday that he told for the first time to anybody. That [I.W.] had confided to him had suggested that she was sorry for what happened that morning and—he inferred that she did something to the baby from that. That lie, if he was going to tell it—if that was the truth, he would have told it a long time ago. . . ."

Later the prosecutor stated: "The theory goes something like this: The thinking is after three and a half years of not protesting his innocence and saying that [I.W.] did it, why would those cops believe him? Why would you believe him? Are you the ones who are supposed to be fooled by that and Detective Longoria is not? Is that how that works?"

Finally, the prosecutor added, "Watch those DVD's. Watch his behavior. He can turn that stuff on and off, just like he did for you. He's had three and a half years to put this thing together, and he didn't get it right."

7

court of the opportunity to address the errors he raises for the first time on appeal, defendant's claim of prosecutorial misconduct in conjunction with *Doyle* error has not been preserved for purposes of appeal, and thus he has forfeited his claim.

**B.  *Doyle* Error**

Notwithstanding forfeiture, there was no *Doyle* error or related prosecutorial misconduct.  In *Doyle*, the United States Supreme Court held the impeachment of a defendant at trial with his postarrest silence after being admonished pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), would violate the Due Process Clause of the Fourteenth Amendment.  (*Doyle, supra*, 426 U.S. at p. 619; *People v. Clark* (2011) 52 Cal.4th 856, 959 (*Clark*).)  *Doyle* error can occur during examination of witnesses or closing argument.  (*People v. Lewis* (2004) 117 Cal.App.4th 246, 256.)  However, in either situation, the rule in *Doyle* "prohibits the prosecution from exploiting a defendant's post-*Miranda*-advisement silence."  (*Lewis*, *supra*, at p. 256; *Clark, supra*, at p. 959; see also *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1555-1556.)

In *People v. Galloway* (1979) 100 Cal.App.3d 551, 556-558, the appellate court found *Doyle* error when the prosecutor asked about and commented on the defendant's silence about an alibi until he testified at trial.  Here, defendant was not silent.  He expressly waived his rights to silence and counsel following the *Miranda* advisement, and reaffirmed what he had previously told Detective Longoria. Rather than remaining silent, defendant reaffirmed his actions towards Mya without mentioning his suspicions about I.W.  Therefore, *Doyle* does not apply.

8

A similar *Doyle* claim was rejected by the California Supreme Court in *People v. Osband* (1996) 13 Cal.4th 622 (*Osband*), in which defendant waived his *Miranda* rights in a postarrest interview and offered the alibi that he was not at the crime scenes, whereas, at trial the defendant admitted that he had committed crimes at both locations. (*Osband*, *supra*, at p. 694.) The court held it was not *Doyle* error to question defendant about his prior inconsistent statements, and "'[s]uch questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.'" (*Osband, supra*, at p. 694, citing *Anderson v. Charles* (1980) 447 U.S. 404, 408.)

Here, defendant did not remain silent in his interview after receiving *Miranda* warnings. He maintained that he may have caused Mya's injuries by playing rough with her, dropping her, or causing her to hit her head on the bed. However, at trial, he recanted his statements, claimed that he had fabricated them, and decided to implement I.W. as the possible cause of Mya's injuries. Thus, the prosecutor's questioning of defendant about the inconsistencies between his prior statements and trial testimony did not constitute *Doyle* error. (*Osband, supra*, 13 Cal.4th at p. 694; *Anderson v. Charles*, *supra*, 447 U.S. at pp. 406, 408-409 [*Doyle* does not apply when defendant waives *Miranda* rights and makes a statement but then gives a different version at trial].) Rather, the questions were designed to elicit an explanation for his prior inconsistent statements

and attack I.W.'s alleged hearsay statement to defendant.[4]  They were not designed to draw meaning from defendant's silence in violation of *Doyle*, but to impeach both defendant and I.W.'s alleged hearsay statements.

### III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant protests that he was deprived of his constitutional right to effective assistance of counsel because trial counsel failed to object to the prosecutor's cross-examination about defendant's postarrest silence regarding I.W.'s involvement in Mya's injuries on *Doyle* error grounds.  He further faults his counsel for failing to request pinpoint instructions on third-party culpability so that the jury would be able to assess the defense, the burden of proof and its relation to reasonable doubt.

### A.  Standard of Review

"The standard for establishing ineffective assistance of counsel is well settled.  A defendant must demonstrate that:  (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant.  [Citation.]  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

_____

**4**  The prosecutor's hearsay objection to I.W.'s alleged statements to defendant was overruled and defendant was allowed to testify as to what he claimed that I.W. told him.

**B. Failure to Object to *Doyle* Error**

Because we have concluded there was no *Doyle* error, we likewise conclude there was no ineffective assistance of counsel for failing to object. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

**C. Pinpoint Instruction on Third-party Culpability**

From the outset of the case, defense counsel indicated to the jury that "this is a case of injury by the hands of another." Defendant testified that he initially lied about his involvement in Mya's injuries to protect I.W., whose actions suggested her culpability. Defense counsel's closing argument focused on I.W.'s culpability. Recognizing there is no CALCRIM or CALJIC instruction that directly addresses the third-party culpability defense presented in this case, defendant nonetheless contends "this does not lessen trial counsel's duty to offer pinpoint instructions governing all elements of the defense case." He further claims that counsel should have requested modification of the credibility instructions, including CALCRIM Nos. 362 [consciousness of guilt] and 370 [motive]. He maintains instructions that were tailored to address I.W.'s culpability were critical to the jurors understanding this case.

Assuming, without deciding, that defendant's attorney's performance fell below an objective standard of reasonableness in ensuring that the jurors were properly instructed on all elements of defendant's defense, we must determine whether there is a reasonable probability that, but for counsel's error, defendant would have received a more favorable result. Here, we conclude that there was not.

11

The only evidence pointing to I.W.'s culpability came from defendant's self-serving statements. He claimed that I.W.'s words suggested she may have done something to harm Mya, and she agreed to come to court to tell the truth but failed to do so. However, defendant admitted that he did not know if she did anything and could not "finger her." In contrast, defendant initially admitted his actions could account for Mya's injuries. Such admission presented a strong case against him. Clearly, the primary issue was defendant's credibility. Should the jury believe defendant's initial statements to the investigating detectives or his trial testimony? To that end, the jury was instructed that defendant was presumed innocent and the People bore the burden of proving guilt beyond a reasonable doubt. (CALCRIM No. 220.) "Unless the evidence proves the defendant[] guilty beyond a reasonable doubt, [he is] entitled to an acquittal and you must find [him] not guilty." The jurors were tasked with deciding the facts and the credibility of the witnesses, including defendant. They heard the evidence and argument of counsel.

Given the strong evidence of defendant's guilt, coupled with the instructions received by the jury, counsel's alleged errors were not "so serious as to deprive the defendant of a fair trial . . . ." (*Strickland v. Washington, supra*, 466 U.S. at p. 687.) Thus, because defendant failed to show that he suffered any prejudice as a result of his counsel's performance, we conclude that there is no reasonable probability that counsel's failure to request pinpoint instructions affected the verdict.

## IV. DISPOSITION

We reject defendant's claims of *Doyle* error and ineffective assistance of counsel and affirm the judgment.

12

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

MCKINSTER
J.

CODRINGTON
J.